# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| W.K., E.H., M.M., R.P., M.B., D.P., A.F., C.A., R.K., K.P., and T.H., <br><br> Plaintiffs, <br><br> v. <br><br> RED ROOF INNS, INC., FMW RRI NC, LLC, RED ROOF FRANCHISING, LLC, RRI WEST MANAGEMENT, LLC, VARAHI HOTEL, LLC, WESTMONT HOSPITALITY GROUP, INC., and RRI III, LLC, <br><br> Defendants. | CIVIL ACTION FILE <br><br> NO. 1:20-cv-5263-MHC <br><br> JURY TRIAL DEMANDED <br><br> Pursuant to Fed. R. Civ. P. 38 |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................5

I.    Anyone who set foot on the Smyrna and Buckhead Red Roof Inn properties witnessed an open-air prostitution market.................................5

    A.    Prostitution was obvious and constant at both locations. .....5

    B.    Police witnessed prostitution at Smyrna and Buckhead.....14

    C.    Hotel customers told Red Roof about prostitution at both hotels. ..................................................................................17

II.    Hotel staff showed traffickers, pimps and prostitutes extraordinary hospitality, and they rewarded Defendants with their loyalty and money. .......................................................21

    A.    Hotel employees actively assisted traffickers in multiple ways. ...................................................................................21

    B.    Defendants operated the Smyrna and Buckhead Properties to maximize revenue from prostitution...........................................25

III.    Corporate employees also had direct knowledge of the prostitution and trafficking at the Smyrna and Buckhead Red Roof Inns. ...................................................................................30

    A.    Even after a human trafficking activist told Red Roof's C-Suite executives about the conditions at Smyrna, conditions got worse. ..................................................................................30

    B.    A Red Roof Regional Vice President "joked" about "pimps and hos" at the Buckhead property...........................................32

    C.    Sex trafficking, not just prostitution, was a problem known to the hotel industry and to Red Roof. .............................................34

ARGUMENT AND CITATION TO AUTHORITY ...........................................38

I.    Defendants violated Georgia RICO by catering to traffickers, pimps, and prostitutes. ..................................................................38

    A.    Defendants engaged in a pattern of racketeering activity. .39

        1.   Defendants were keeping a place of prostitution. ..........41

        2.   Defendants' assistance makes them liable for sexual servitude, pimping, and prostitution as parties to the crime. ......................................................................47

    B.     Defendants' actions led directly to Plaintiffs' injuries. .......52

    C.     Defendants engaged in a RICO Conspiracy. ........................55

    D.     Defendants may be directly liable because corporations are "persons" under Georgia RICO. ....................................57

    E.     A victim cannot be an accomplice to her own sexual servitude. ..................................................................59

II.    The extensive record establishes a jury question on the TVPRA claims ....................................................................................60

    A.     Defendants knowingly participated in a venture of renting rooms to prostitutes and pimps. .......................................61

    B.     This venture of renting to known prostitutes and pimps violated the TVPRA as to each of the Plaintiffs. ............................63

    C.     The Defendants knew or should have known about the TVPRA violations as to the Plaintiffs. ...............................68

        1.   The record contains evidence of knowledge of trafficking at Buckhead as to the WK Plaintiffs. ................71

        2.   The record contains evidence of knowledge of trafficking at Smyrna as to the WK Plaintiffs. ....................74

    D.     A TVPRA civil claim does not require a criminal conviction. ..................................................................79

    E.     Rule 19 does not support dismissal. .......................................80

III.   The evidence supports Plaintiffs' negligence claims. ......................86

    A.     Plaintiffs were invitees. .............................................................86

1. Whether rooms were rented by Plaintiffs or others, Georgia law makes Plaintiffs invitees on the hotel properties. ...................................................86

2. Plaintiffs' engagement in commercial sex does not change their status as invitees. .............................87

B. Defendants have a duty to take reasonable steps to prevent reasonably foreseeable criminal acts. ..............................89

1. The obviousness of the danger and Red Roof's acknowledgment of it eliminate the need for evidence of prior similar crimes. ...............................................90

2. Though unnecessary, there is ample evidence of prior similar crimes at both locations. ..............................93

3. A jury must decide whether Plaintiffs had equal knowledge. ...............................................................97

C. The Red Roof Defendants are directly liable for their own conduct. ...............................................................98

D. Plaintiffs' negligence claims are not time-barred. ...............99

CONCLUSION.....................................................................100

## INTRODUCTION[1]

The heart of the hotels' defense is that they just didn't know about prostitution, but if they did, they definitely didn't know about sex trafficking. Because the evidence shows they knew about both, Defendants' motions for summary judgment should be denied. Between 2010 and 2018, the Smyrna Red Roof and the Buckhead Red Roof catered to traffickers, pimps and prostitutes. In exchange, these customers returned again and again, rewarding the hotels with their loyalty and helping the Smyrna and Buckhead hotels become financial "top performers." In service of this profitable sex trade, Defendants were indifferent to the women and girls being sold.

This brief uses "prostitution" to refer to sex acts in exchange for money, or the crime of prostitution. Where prostitution results from force, fraud, coercion or deception, it is sex trafficking. Prostitution by a person under 18 years old is always sex trafficking. Because keeping a place of prostitution is a Georgia RICO predicate act, both prostitution and sex trafficking are relevant here.

Prostitution was rampant at both the Smyrna and Buckhead hotels. Forrest

---

[1] Citations to "Ex." refer to the Exhibits attached to the Plaintiffs' Notices of Filing Exhibits. Except for deposition excerpts and interrogatory responses, page numbers in citations refer to the page numbers affixed by the Court's electronic filing system. Plaintiffs are also filing compilation exhibits, Exhibit A and B, for which citations are the page numbers Plaintiffs affixed to those documents. Finally, internal quotations, citations, and alterations are omitted from legal citations and emphasis is added.

Castille, a Smyrna front desk employee from 2008 to 2016 described it this way: "It was never a minute that I worked at Red Roof Inn, never a year I worked at Red Roof Inn that there was not prostitution going on in there."[2] Monica Hamilton, a weekend security guard at Buckhead from 2013 to 2016 said, "It was no way you couldn't know. It was just that obvious. There was no way you could not know."[3] Defendants' employees witnessed not just prostitution, but trafficking, including women being beaten "like they were men," at Smyrna and 14-year old girls at Buckhead dressed in "skimpy outfits" and teetering on high heels they could barely walk in.[4] Employees at both hotels admitted they saw teenage girls, minors under 18 years old, being sold for sex.[5] And they acknowledge that what they saw was trafficking, not so-called, voluntary prostitution.[6] Plaintiffs each exhibited obvious signs of trafficking when they were sold at Defendants' hotels.

Defendants' assertion that they knew nothing and saw no one appears to be based on their own made-up definition of "knowledge." Current Red Roof president, George Limbert, then general counsel, received an email identifying a "sex trafficker" at the

---

[2] Castille Dep. (Ex. 19) 42:22-43:4.

[3] Hamilton Dep. (Ex. 41) 102:25-103:17; 142:17–23.

[4] Castille Dep. (Ex. 19) 26:20–27:13; Hamilton Dep. (Ex. 41) 87:11-19.

[5] Castille Dep. (Ex. 19) 28:6-14 (Smyrna); Cole Dep. (Ex. 15) 37:4-38:7 (Buckhead); Thomas Dep. (Ex. 14) 32:6-12 (Buckhead); Hamilton Dep. (Ex. 41) 88:23-94:25.

[6] Castille Dep. (Ex. 19) 22:18-24:17; Conner (Dep. 40) 52:10-12; Cole Dep. (Ex. 15) 24:19-25:5; -5; Thomas Dep. (Ex. 14) 46:18-47:10; Hamilton Dep. (Ex. 41) 97:13-25.

Smyrna property. Red Roof dismissed the email as "unverified." Incredibly, Limbert later testified that a hotel could know of trafficking only "by witnessing a sex act."[7] But one need not be an eye-witness to a sex act to have notice of it. The test is whether a reasonable innkeeper should recognize the illegal conduct happening right in front of him, not whether he can conjure some other benign explanation for it.

**A note about the Response Brief:** Plaintiffs are filing nearly identical briefs in both *W.K. v. Red Roof Inns*, 20-CV-5263-VMC, and *Jane Does 1-4 v. Westmont,* 21-CV-4278-WMR. That's because all 15 Plaintiffs' injuries arise from the same Defendants' course of conduct at two hotels across a span of about 9 years.

Defendants' separately filed motions seek to obscure the consistency of Plaintiffs' collective testimony. Still, they tacitly acknowledge the factual and legal overlap, as the arguments they raise for each Plaintiff are mostly the same. This Court should not consider each Plaintiff's claims in isolation because Defendants' conduct is remarkably consistent across Plaintiffs, across hotels, and across time.

And because a "RICO action is based upon a pattern of activity," each of these acts is admissible evidence against every Defendant "to confirm and amplify" the pattern of racketeering activity. *InterAgency Fin. Corp. v. Danco,* 203 Ga. App. 418, 424 (1992). The same is true even if the defendant "may reasonably claim no direct participation

---

[7] Limbert Dep. Vol. 1 (Ex. 31) 321:20–25.

in some of those acts." *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992).

**A note about Plaintiffs:** This brief uses "Plaintiffs" to refer to the 15 plaintiffs in both cases, but not every Plaintiff asserts every claim. Thus, in discussing particular claims, "Plaintiffs" refers only to those who have asserted that claim. Plaintiffs also attach a Plaintiffs' Claims chart, Exhibit 48, which identifies who sued which Defendant on what claims. Supporting facts specific to each Plaintiff are below and further detailed in their Statement of Disputed Facts.

**A note about Defendants:** During the trafficking period, Buckhead was owned and operated by Red Roof corporate affiliates,[8] and until December 14, 2012, so was Smyrna.[9] The relevant Red Roof affiliate Defendants included: A real estate holding company that owned the land, FMW (Smyrna) and RRI III (Buckhead); a management company operating the hotel and employing regional staff, RRI West; and Red Roof Inns, Inc., which employed the location staff.[10] After December 14, 2012, when Defendant Varahi, LLC purchased the hotel, Varahi owned the land, employed the staff, and contracted with Defendant Red Roof Franchising to use the brand.[11] Varahi

---

[8] Park Dep. (Ex. 34) 47:5–21.

[9] Moyer Dep. (Ex. 18) 30:10–18.

[10] Park Dep. (Ex. 34) 46:6–8 (FMW), 47:18–21 (RRI III); 50:22–52:3; 60:14–17, 118:23–25. (RRI West); Limbert Dep. Vol. 1 (Ex. 31) 143:4–8 (Red Roof Inns, Inc.).

[11] Ex. 167 at § 1.1; 5.10.

paid royalties and fees to Red Roof Franchising,[12] which in turn pays Red Roof Inns, Inc.[13] Exhibit 51 summarizes each Defendant's role.[14] Exhibit 50 identifies material persons and their employer. Supporting facts are in Plaintiffs' Statement of Disputed Facts. Some witnesses were unsure which Red Roof entity employed them, and others were employed by different Red Roof entities at different times. Regardless, other than Westmont, separate Red Roof Defendants have not moved for summary judgment based on individualized facts.[15]

## BACKGROUND

### I.   Anyone who set foot on the Smyrna and Buckhead Red Roof Inn properties witnessed an open-air prostitution market.

Between 2010 and 2018, evidence shows that the Smyrna and Buckhead Inns did not just tolerate prostitution, they knowingly chose to profit from it.

#### A. Prostitution was obvious and constant at both locations.

At the Smyrna and Buckhead Inns, under-dressed women loitered on balconies

---

[12] Varahi 30(b)(6) Dep. (Ex. 12) 39:22–40:23; 44:6–10.

[13] Park Dep. (Ex. 34) 82:13-84:5, 85:21–86:10.

[14] Rule 1006 summary exhibits may be considered at summary judgment, *Mitchell v. Univ. of La. Sys.,* 154 F.Supp.3d 364, 380 n.8 (M.D. La. 2015), especially here where the supporting documents are also provided.

[15] In discovery, the Red Roof Defendants largely failed to distinguish among corporations, generally producing one set of documents on behalf of all companies. The act of producing documents is itself evidence they "were in [the party's] possession or control." *United States v. Hubbell*, 530 U.S. 27, 36 (2000). So a jury can infer such documents were in the Red Roof Defendants' collective possession and comprised their collective knowledge.

and breezeways. Jane Doe 3 testified that at both hotels, "a majority of the patrons were pimps and their workers."[16] "You could see girls hanging off the balcony in their short clothes, … girls walking around beating their feet with no clothes on, talking on cell phones, meeting johns, taking them up their rooms."[17] Women recounted loitering outside at both hotels and interacting with hotel staff while wearing heels, short dresses and shorts, and other, similar clothes.[18] MM said she "fit in" at Smyrna: "There was pimps, there was girls in short tops and bootie shorts and heels roaming around the property."[19] Brenda Conner, a Smyrna housekeeper from 2013 to 2016, described young women hanging "over the balconies with very little clothing."[20] Michael Thomas, a Buckhead housekeeper and front desk employee in 2012,[21] saw women "hanging on the balcony in a negligee."[22]

Further, many of the prostitutes were with pimps, a sure sign of trafficking, who

---

[16] JD3 Dep. (Ex. 5) 314:6-10.

[17] JD3 Dep. (Ex. 5) 160:20–161:2.

[18] DP Dep. (Ex. 7) 263:3–21; TH Dep. (Ex. 23) 274:4–17; RP Dep. (Ex. 10) 218:16–23, 235:13–25 (she picked up "tricks in the parking lot" of Smyrna); AF Dep. (Ex. 24) 242:8–14, 247:17–21, 248:19–24 (at Smyrna, she would "wear high heels, really short shorts, crop tops," while loitering for dates).

[19] MM Dep. (Ex. 25) 269:8–23, *id.* at 261:17–18 (identifying time period).

[20] Conner Dep. (Ex. 40) 12:3–6; Conner Aff. (Ex. 67) ¶ 7.

[21] Thomas Dep. (Ex. 14) 15:2–7. Thomas, like other workers at Buckhead, was an employee of Red Roof Inns, Inc. Limbert Vol. 1 (Ex. 31) 143:4–8.

[22] Thomas Dep. (Ex. 14) 103:16–17.

would keep watch on their victims outside the rooms or wait around the corner.[23] Jane Doe 3 testified to "pimps in their cars in the parking lot."[24] Brenda Conner recounted a known pimp at Smyrna—later identified to Red Roof executives by name—who would "sit in his truck" and "look[] upstairs right in his room" or sit in the hotel's office when the women he pimped were seeing a john.[25] This man rented Room 201 continuously from the time Conner began working there "until they put him out."[26]

The pimps were not discrete. "Most of [the pimps] ha[d] on a pinky ring, lots of flashy jewelry, dr[o]ve nice cards, and they always [were] surrounded by women."[27] At both locations, Plaintiffs and employees reported that victims or their pimps paid for rooms daily and with cash, even for multiple day stays.[28] The traffickers or their victims would often rent multiple rooms with multiple girls in each room, and men

---

[23] MB Dep. (Ex. 9) 203:16–20 (pimp would park outside her hotel room when she was seeing a date); JD1 Dep. Vol. 1 (Ex. 1) 162:1-4; JD2 Dep. Vol. 1 (Ex. 3) 200.

[24] JD3 Dep. (Ex. 5) 160:20–161:2; *see also* Thomas Dep. (Ex. 14) 34:3–9, 36:8–13. (describing a pimp in a wheelchair who was a "regular," "congregat[ing] in the parking lot" with "his buddies").

[25] Conner Dep. (Ex. 40) 35:6–12.

[26] Conner Dep. (Ex. 40) 35:16–18.

[27] JD3 Dep. (Ex. 5) 161:7-9; *see also* EH Dep. (Ex. 8) 69:16–23 (pimps were "[a]lways very flashy, always wearing diamonds").

[28] Cole Dep. (Ex. 15) 38:7 (Smyrna); MB Dep. (Ex. 9) 189:3–23 (Smyrna); RK Dep. (Ex. 22) 267:5–12, 271:23–24 (Buckhead); TH Dep. (Ex. 23) 272:12–17, 274:20–21 (Buckhead).

would come and go from the room throughout the day.[29]

Witnesses observed near-constant foot traffic in and out of rooms rented to prostitutes. Forrest Castille testified to seeing "8 to 10, maybe 15 to 20" girls or women at Smyrna at a time and that the activity "never stopped," with at times "over 50, 60 men a day" patronizing the location.[30] Vanessa Cole, who worked at the Smyrna location between July 2011 and December 2012, described "adult men going in and out of rooms … in short order."[31] Smyrna housekeeper Brenda Conner also said she saw "as many as 100 buyers" a day[32] and men entering and leaving rooms after a short period of time "[b]asically every day."[33] The conditions were no different at Buckhead, where Michael Thomas described women being "dropped off" and then "men coming out – in and out of their rooms."[34]

Employees' observations are consistent with Plaintiffs' testimony. Women described a constant stream of work: "You literally don't even get a break. It's like literally back to back to back to back."[35] At both properties, victims described being

---

[29] JD3 Dep. (Ex. 5) 303:17–18; TH Dep. (Ex. 23) 138:2–7, 276:7–9; RK Dep. (Ex. 22) 265:12–16; JD2 Dep. Vol. I (Ex. 3) 203:204:2; CA Resp. to Rog. (Ex. 70) at 28.
[30] Castille Dep. (Ex. 19) 22:15–17, 37:10–11, 37:19–23.
[31] Cole Affidavit (Ex. 65) ¶ 4; Cole Dep. (Ex. 15) 39:20–23.
[32] Conner Aff. (Ex. 67) ¶ 11.
[33] Conner Dep. (Ex. 40) 29:6–18; 106:12–15.
[34] Thomas Dep. (Ex. 14) 103:12–13.
[35] JD2 Dep. Vol. 1 (Ex. 3) 200:5–7 (Buckhead); DP Dep. (Ex. 7) 48:6–8, 296:22–297:2. ("We had dudes following us around all the time.")

8

made to see 10 or more buyers per day to satisfy their quotas,[36] with buyers nearly every hour and men waiting their turn in the parking lot.[37]

At Smyrna, employees described prostitution so pervasive that there was no need to report it to higher-ups because it was "already known."[38] Varahi owner, Bob Patel, admitted to placing a sign at the front desk that read, "No Refunds after 15 Minutes."[39] An email from a front desk employee to Bob in 2014 dispels any suggestion that Bob was unaware of prostitution. The employee wrote, "[w]e are allowing too many hookers to stay here" and suggested that they call the police "to remove these prostitutes."[40] In response, Bob did not encourage his employee to call the police or to stop renting to prostitutes. Instead, he suggested telling them simply to "stay in your room or we will call police."[41] This email isn't an aberration. Castille said he certainly "never" called the police to report prostitution.[42] Brenda Conner testified that Bob told

---

[36] TH Dep. (Ex. 23) 149:6–150:17, 150:25–151:8 ("to eat, we had to make a thousand dollars."); WK Dep. (Ex. 11) 120:7–121:9 (quota meant up to 15 buyers); JD2 Dep. Vol. 1 (Ex. 3) 189:20–190:2; JD3 Dep. (Ex. 5) 138:2–6 ("thousand-dollar-a-day quota," which meant at least 10 buyers); AF Dep. (Ex. 24) 214:10–22 (Smryna quota higher because hotel was always "really busy with action and prostitution").
[37] JD2 Dep. Vol. 1 (Ex. 3) 122:13–19.
[38] Conner Dep. (Ex. 40) 70:3–4; Castille Dep. (Ex. 19) 127:25, 128:7–9; Conner Dep. (Ex. 40) 70:3–4.
[39] B. Patel Dep. (Ex. 17) 71:13–17; Lam Dep. (Ex. 35) 229:18–230:13.
[40] Ex. 110.
[41] *Id.*
[42] Castille Dep. (Ex. 19) 125:5–6.

her "don't call anybody" and "not to interfere with" what guests "had going on."[43]

At Buckhead, Michael Thomas recounted a "revolving door" of pimps and prostitutes.[44] Vanessa Cole floated as a general manager at the Buckhead location between 2011 and 2012, during which prostitution was a "consistent problem" and one that she reported "up the chain."[45] Cole testified she specifically reported this to Jay Moyer,[46] the Regional Vice President of Operations charged with managing both the Smyrna property until it was franchised and the Buckhead property during all relevant times.[47] Monica Hamilton called Buckhead "hotel hell" and testified "[t]here was no way you could not know."[48] As TH testified, "[i]t was in your face,"[49] while RP recalled "girls in every single room" "pimps everywhere."[50] And it was clear to RP why: "[N]o one ever gets in trouble at the [Buckhead] Red Roof."[51]

Beyond the hotels' exterior, the rooms—visible to housekeeping and others—erased any doubt about what was happening inside. Plaintiffs and other victims testified

---

[43] Conner Dep. (Ex. 40) 29:24–25; 52:15–19.
[44] Thomas Dep. (Ex. 14) 27:21-24.
[45] Cole Dep. (Ex. 15) 30:21–31:1.
[46] Cole Dep. (Ex. 15) 36:23–37:3.
[47] Moyer Dep. (Ex. 18) 30:10–18, 45:15–22.
[48] Hamilton Dep. (Ex. 41) 26:5–22 (hotel hell), 142:17–23.
[49] TH Dep. (Ex. 23) 276:15.
[50] RP Dep. (Ex. 10) 218:3–6.
[51] RP Dep. (Ex. 10) 218:7–20.

about their constant "requests for towels" to clean up between buyers[52] and trash cans "overflowing" with condoms at both locations.[53] EH recalled a Smyrna housekeeper nearly congratulating her when bringing her linens, saying, "You're making some good money today, huh?"[54]

At Smyrna, Vanessa Cole testified to "a lot of condom packages," "costumes" and "wigs" in rooms and requests for extra linens.[55] Brenda Conner similarly described cleaning rooms with "condoms all over the floor" and "[a] whole lot of lubricants and condoms on the dressers."[56] MB testified that one day at Smyrna, after she watched her trafficker beat another victim, she personally handed a housekeeper a trash can with an estimated 30 condoms, making sure the condoms were on top so staff could easily spot them.[57] And condom-filled trash cans weren't the only sign of trouble. MB also gave the housekeeper bloody sheets and towels. Fearing retaliation from her trafficker, MB

---

[52] JD3 Dep. (Ex. 5) 162:16-19; *see also* MB's Dep. (Ex. 9) 195:13–23 (she "always needed" towels at Smyrna); EH Dep. (Ex. 8) 125:5–11 (a Smyrna housekeeper would "bring her stacks of towels, on average three times per day"); AF Dep. (Ex. 24) 39:6–40:6; RK Dep. (Ex. 22) 267:5–18; TH Dep. (Ex. 23) 275:5–17.
(frequent interactions with Buckhead employees to get more linens).
[53] JD3 Dep. (Ex. 5) 162:16-19.; *see also* JD1 Dep. Vol. I (Ex. 1) 194:16–17; TH Dep. (Ex. 23) 275:19–276:1 (up to 20 condoms in trash in room shared with RK).
[54] EH Dep. (Ex. 8) 127:16–25.
[55] Cole Dep. (Ex. 15) 38:18–19.
[56] Conner Dep. (Ex. 40) 24:12–13, 25:1–2; *see also* TH Dep. (Ex. 23) 276:3–4 (describing "lube and boxes of condoms in the room").
[57] MB Dep. (Ex. 9) 200:22–201:18.

told the housekeeper only that there was "a lot going on."[58]

Signs of violence were common at both hotels, too. From outside, women described hearing people being beaten inside rooms.[59] One Plaintiff described being beaten at Smyrna in the parking lot in public view or otherwise in the presence of hotel staff.[60] Also at Smyrna, DP recounted a loud fight with her trafficker, after which a security guard cornered her warning her only to be more "quiet," otherwise, "he was going to call the police because he knew what [they] were doing."[61] Jane Doe 4 described the Smyrna property as "ruthless," with a constant flow of pimps, scantily clad women with bruises on their arms, girls being beaten within earshot, and even the sound of sexual violence through the thin walls.[62]

Smyrna employee Castille confirmed all of this and more, testifying that he saw women beaten "like they were men." He continued, "I've seen bruises, black eyes. You could tell when somebody has been choked because … their necks are bruised up." And he also witnessed how traffickers "would turn them on to drugs so bad so that you had to work to get your dope or get your fix." When asked how old the girls were, Castille said "young," adding that "the younger they were, to me, from my observation,

---

[58] MB Dep. (Ex. 9) 196:20–197:6, 199:21–200:9.
[59] *See, e.g.*, JD1 Dep. Vol. 1 (Ex. 1) Dep. 196:4–14; JD4 Dep. (Ex. 6) 106:22–107:1.
[60] JD1 Dep. Vol. 1 (Ex. 1) 196:4–16.
[61] DP Dep. (Ex. 7) 40:15–24.
[62] JD4 Dep. (Ex. 6) 59:23–60:4, 106:19–107:1.

the more they had control of them."[63]

In December 2014, 16-year-old WK had been trafficked at the Smyrna property for a few days prior when her trafficker choked her just outside the hotel room. WK recalls making eye contact with a hotel employee pushing a housekeeping cart, but he made no effort to help. The trafficker then dragged WK back into the room where her trafficking continued and he nearly drowned her in the bathtub.[64]

At Buckhead, onsite security knew the pimps were armed. Monica Hamilton testified that when she tried to approach men she saw with very "young girls," "they showed [her] their guns."[65] She described young girls being controlled by pimps "like they were brainwashed. … [T]hey couldn't say what they wasn't going to do or what— you know . . . they couldn't never make up their own mind not even when it came to what you want to eat."[66] Cole's testimony, too, confirms that Buckhead staff saw not only many young women, but also signs they were being controlled and trafficked. Cole testified, for example, about girls aged 16, 17, 18, being checked in by a single adult paying cash, and how "they were not allowed to speak to us. They were not allowed to look at us or engage with us."[67]

---

[63] Castille Dep. (Ex. 19) 26:20–27:13.
[64] WK Dep. (Ex. 11) 147:25-153:24.
[65] Hamilton Dep. (Ex. 41) 89:1 (young girls), 87:2–88:18 (showed guns).
[66] Hamilton Dep. (Ex. 41) 97:13–98:15.
[67] Cole (Ex. 15) 37:4–39:5.

## B. Police witnessed prostitution at Smyrna and Buckhead.[68]

Throughout Plaintiffs' trafficking, police reports described the Smyrna Property and its parking lot as a location "notorious" for crime, including specifically prostitution.[69] Officers described Smyrna as "a high crime lodging facility known for prostitution"[70] and an "area known for increased crime including drugs, robbery, and prostitution."[71] Beyond prostitution-related arrests,[72] the reports often confirm police

---

[68] Police reports, along with other evidence discussed in Part I.C., are compiled at Exhibit A, (Smyrna) and Exhibit B (Buckhead). A court may consider hearsay or other otherwise inadmissible evidence at summary judgment "if the statement could be reduced to admissible evidence at trial, for example by having the hearsay declarant testify directly to the matter." *Smith v. LePage*, 834 F.3d 1285, 1296 n.6 (11th Cir. 2016). And the officers' observations in reports are subject to hearsay exceptions, *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) (discussing Rules 803(6, 8), and holding that statements made to officers may be subject to exceptions for statements against interest under Rule 804(b)(3)).

[69] Smyrna Compilation (Ex. A) at 1494 (2015: "The Red Roof Inn is notorious for drug dealing and prostitution."); *see also id.* at 56 (2011: "This location is known for drugs and prostitution."); *id.* at 322 (May 2012: "This hotel is an area noted for illicit activity such … prostitution."); *id.* at 632 (2013: "The Red Roof has seen a large increase of prostitution …."); *id.* at 838 (2014: "The hotel is also a frequent place where prostitution occurs."); *id.* at 1672 (2016: "This parking lot is known for drugs, prostitution, and other crimes.").

[69] Smyrna Compilation (Ex. A) at 56.

[70] *Id.* at 1655.

[71] *Id.* at 2016; *see also id.* at 1699 (2016: "[T]he area [is] known for high crime, prostitution, and drug use ….").

[72] *E.g., id.* at 20 (2010: Woman arrested for prostitution).

14

interacted directly with hotel employees,[73] guests admitted to police they were prostitutes,[74] and investigation led police to conclude that guests were engaged in prostitution.[75] For example, police observed four women in a room with "a stack of folded $20s lying on the dresser, a condom beside the $20s, [and] used condoms in the trash."[76] Other times, hotel staff reported to police that guests were prostitutes.[77] And at least two police reports detail the experiences of women who escaped from traffickers at Smyrna. In 2013, two nineteen-year-old guests called police after a man kicked them out of the room he rented when they said no after he "asked them if they

---

[73] *E.g.,* Ex. A at 396-404 (September 2012: three women arrested for prostitution and one also charged with keeping a place of prostitution); *id.* at 509-10 (2013: 19-year-old woman arrested for prostitution); *id.* at 532-533 (2013: 22-year-old woman arrested for prostitution); *id.* at 1092 (2015: man arrested for pimping and keeping a place of prostitution, among other charges).

[74] Ex. A at 279 (February 2012: two women confessed they were working as prostitutes); *id.* at 362 (June 2012: woman told police she had answered a Backpage ad to work as an escort and had sex for money with two men the night before under the direction of "Daisy," who then stole her phone); *id.* at 1045 (2014: guest told police "that she was a prostitute"); *id.* at 1202 (2015: man, whom police had observed leaving room, told them that he had just patronized a prostitute); *id.* at 1292 (2015: man told police he "drove a prostitute to the Red Roof Inn" in exchange for crack); *see also* Ex. 61 (2017: guest told police that she was a prostitute).

[75] Ex. A at 683; *id.* at 762 (police identified a witness to crime as a prostitute); *id.* at 883 (2014: officer concluded that man reporting armed robbery was a john who had been robbed by a prostitute and pimp).

[76] Ex. A at 349.

[77] *E.g.*, Ex. A at 245 (2011: Vanessa Cole reported "a steady flow of male subjects into and out of" certain rooms "at all times of the day"); *id.* at 628 (2013: Forrest told police that a guest who had broken a window was a prostitute).

wanted to prostitute."[78] In 2017, a guest told police that "she was kidnapped and force[d] into prostitution."[79]

Further, information that Cobb Police gave to Varahi and Red Roof corporate employees Vickie Lam and Greg Stocker in 2017 confirms that there was far more police activity at the Smyrna Inn than at any nearby hotel.[80] Police data that Red Roof Defendants produced show that from 2013 to 2016, the Smyrna property had more reported offenses and more arrests than 5 other nearby hotels.[81]

Law enforcement described the Buckhead location, too, as "a trouble area for illegal drugs and prostitution,"[82] and for good reason. Police cited both prostitutes and johns there throughout the time Plaintiffs were trafficked.[83] In 2013, police even

---

[78] Ex. A at 492.
[79] Ex. A at 1944. Again, the report confirms that officers spoke to front desk staff and housekeepers during their investigation. *Id.* at 628.
[80] Ex. 91
[81] *Id.*
[82] Buckhead Compilation (Ex. B) at 292; *see also id.* at 315 (2013: "This location has been known for heavy illegal narcotics and illegal prostitution activity …."); *id.* at 716 (2015: officers "were patrolling the area … due to recent increases of crime," specifically "prostitution"); *id.* at 748 (2016: "There has been an increase in illegal narcotics activity, prostitution, and entering auto's at the location."); *id.* at 830 (2016: officer notes "the increase of illegal narcotics and prostitution activity in the immediate area").
[83] Ex. 63 (2011: woman arrested for loitering for sex in the parking lot; Buckhead Compilation (Ex. B) at 133-36 (2012: two women arrested for prostitution);; *id.* at 194 (2013: two women arrested for prostitution; one also charged with pimping and keeping a place of prostitution); *id.* at 437-8 (2014: two women arrested for prostitution); *id.* at 863; *id.*at 1125 (2017: man cited for pandering).

encountered a pimp, Anthony Shivers, who lived in the unit above the Smyrna location's office at the Buckhead Inn: Police arranged a meeting with a prostitute at Buckhead, and when they arrived, Shivers was at Buckhead with the woman.[84]

### C. Hotel customers told Red Roof about prostitution at both hotels.

In 2013, then-President Andrew Alexander told press that he was "obsessed with customer feedback," describing reviews as "authentic, unfiltered, direct communication from customers."[85] But if Red Roof was listening to customers and responding appropriately, the conditions at these hotels would have been obvious.

Red Roof collected and distributed customer feedback from surveys, customer hotlines, and online review sites among its highest levels of management. At least monthly, operations Vice Presidents like Jay Moyer and Vickie Lam received so-called "NR" or "negative review" reports compiling information from guest surveys sent upon checkout and calls made to a customer service hotline.[86] Alexander (and others) also received reports from Reputology, an online-review aggregator that compiled reviews for Inns all over the country from sites like TripAdvisor, Booking.com, and Expedia, at least weekly and sometimes daily.[87]

---

[84] Ex. B at 242.
[85] Ex. 150 at 8.
[86] Lam Dep. (Ex. 35) 74:23-80:2.
[87] MacDonald Dep. (Ex. 36) 103:10–104:20; Alexander Dep. (Ex. 30) 39:6–12.

Plaintiffs' Smyrna and Buckhead compilations, include dozens of examples of customer feedback at each location, all retrieved from Red Roof's own internal emails.[88] Defendants reviewed this customer feedback, which paints a compelling portrait of the Smyrna and Buckhead Red Roofs as places where women and girls were advertised to be sold for sex in full view of hotel staff, guests, and anyone else who happened to be there. A sample of these reviews included the following:[89]

**Smyrna:**  (Reviews are quoted as they were written)

- April 2012. "we were told by a motel employee that there was heavy prostitution activity at the location and that 'the place really needed to be cleaned up.'"[90]
- November 2012. "i stay at this property all the time and i would say half the time there some guy in the parking lot is offering me drugs or hookers. Additionally I usually see hookers staying in other rooms as Guests."[91]
- July 2013. "Prostitutes everywhere."[92]
- September 2014. "Then the traffic throughout the day….its a drug and prostitute headquarters."[93]
- March 2015. "Guest stated that prostitutes and drug deal going down in the parking lot."[94]

---

[88] Exhibits A (Smyrna), B (Buckhead).

[89] Defendants try to dismiss these reports as "unverified" hearsay. But evidence offered "to show its effect on the hearer" is not hearsay. *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015). This evidence is admissible to show what Red Roof heard so that a jury may assess the reasonableness of Red Roof's response.

[90] Smryna Compilation (Ex. A) at 295.

[91] Ex. 114 at 2.

[92] Smyrna Compilation (Ex. A) at 218.

[93] Ex. 115 at 5.

[94] Ex. 118.

- May 2015. "Would have been ok if I wanted drugs or a hooker."[95]
- April 2016. "Turned out to be nothing but a hotel for hookers to score. A sign in the lobby said 'no refunds after 15 minutes.'"[96]
- June 2017. "On several occasions a couple of people in our party were approached by females soliciting sex."[97]

**Buckhead**

- August 2011. "There we re, I think, at least three different women (prostitutes) wandering around and approaching us. The whole grounds of the property was active and th ere was no way the staff couldn't have noticed the activity or the noise."[98]
- January 2012. "Said numerous men were going in/ out of rooms with women.. seems illegal activity may have been going on."[99]
- December 2012. "There was a bust by GA sheriffs for drug dealers and 'ladies of the night' at the motel."[100]
- October 2013. "Upon entering the parking lot, we checked in and circled to the back of the building, there were prostitutes getting in and out of cars."[101]
- November 2015. "Hotel had prostitutes."[102]
- February 2016. "there was police patrolling all day and night doing nothing because there was so many hookers on my floor it was sickening."[103]
- September 2016: "the Inn is a whoretel that needs to be checked out by someone higher up in the chain."[104]
- July 2017. "I saw prostitues and drug deals."[105]

---

[95] Ex. 122.
[96] Ex. 121.
[97] Ex. 122.
[98] Ex. 120 at 5.
[99] *Id.*
[100] Buckhead compilation (Ex. B) at 177.
[101] Ex. B at 3.
[102] Ex. B at 683.
[103] Ex. B at 177.
[104] Ex. 113 at 2.
[105] Ex. B at 1113.

Beyond C-Suite executives' regular receipt of these reviews,[106] beginning in 2015, Red Roof examined its reviews for specific "chatter" related to possible criminal activity.[107] This project began after Red Roof pulled its flag (terminated the franchise) from a location in Charlotte, North Carolina, when federal law enforcement sought to forfeit the property because of criminal activity there, including sex trafficking.[108] Red Roof, at the direction of then-general counsel George Limbert and with the help of Chief Marketing Officer Marina MacDonald, engaged its public relations firm to examine reviews for "28 Key Words in 4 Categories" related to "Drugs," "Police," "Weapons," and "Prostitution."[109] The "Prostitution" category included specifically "Escort," "Pimp," "Hooker," and "Whore."[110] The PR firm then created an "attention list" identifying the "[p]roperties with the most criminal chatter." For the most inclusive period examined, May through December 2015, the three properties with the most "chatter" were all in Atlanta. Smyrna was first, and its reviews had nearly twice as many references to prostitution as its next closest competitor. Buckhead was third.[111] Though these reviews were "unverified," Red Roof credited them enough to use them

---

[106] MacDonald Dep. (Ex. 36) 103:10–104:20, 106:10–107:6; Alexander Dep. (Ex. 30) 39:6-12.
[107] MacDonald Dep. (Ex. 36) 128:4–19.
[108] MacDonald Dep. (Ex. 36) 97:19–99:23; Stocker 30(b)(6) Dep. (Ex. 26) 180:6–21.
[109] Stocker 30(b)(6) Dep. Ex. 211 (Ex. 92) at 3.
[110] Ex. 92 at 9.
[111] Stocker 30(b)(6) Dep. Ex. 212 (Ex. 151) at 10.

"to monitor chatter"[112] and to inform its response. A jury may credit them for the same purpose.

## II. Hotel staff showed traffickers, pimps and prostitutes extraordinary hospitality, and they rewarded Defendants with their loyalty and money.

Beyond continuing to rent rooms to guests it knew were prostitutes and pimps, employees at each location assisted the Plaintiffs' trafficking.

### A. Hotel employees actively assisted traffickers in multiple ways.

At both locations, testimony shows employees assisted traffickers by acting as lookouts. Though he denied it, multiple Plaintiffs testified that Forrest Castille accepted money and drugs in exchange for serving as a lookout for traffickers.[113] MM, for example, testified that she interacted with Castille at least 20 times, that her trafficker paid him to serve as a lookout, and that she even "brought Forrest down weed before."[114] Castille confirmed that he took marijuana from men he knew to be pimps—sometimes in exchange for money and sometimes for free.[115]

Castille, however, was not alone. Vanessa Cole "determined" that an employee named Barry was renting rooms off the books, "without entering them in the

---

[112] MacDonald Dep. (Ex. 36) 143:24–25.
[113] JD2 Dep. Vol. 1 (Ex. 3) 45:15–46:22, 201:16–202:9 (Castille would call JD2's trafficker); MM Dep. (Ex. 25) 21:11–21.
[114] MM Dep. (Ex. 25) 21:10–21, 270:7.
[115] Castille Dep. (Ex. 19) 142:4–11, 162:3–6.

reservation system and not accounting for the money."[116] And MM testified that a Smyrna employee named Barry took money from her trafficker in exchange for serving as a lookout. She explained the role this way:

> [W]hile he was at the room at any time, if police were on the property, they were going to call the room and say: Hey look the cops are here. Chill out for a minute. Whatever. … They let him know everything.[117]

Recall, also, that Bob Patel discouraged employees from calling the police.[118] In 2017, Cobb police told Red Roof corporate employees like security director Greg Stocker and Vice President of Franchise Operations Vicki Lam that Bob Patel made "every effort he could to avoid" assisting police, even after the location's nuisance abatement notice.[119] Thus, employees were alerting traffickers to police presence, helping keep police away, *and* failing to assist police when they were there.

Both employees and victims also testified that Smyrna workers set aside select areas of each hotel for sex workers, usually in the back of the building to help them

---

[116] Cole Aff. (Ex. 65) ¶ 20. Jane Doe 2 testified that Forrest, too, would offer traffickers discounts. JD2 Vol. 1 Ex. 3, 45:25-46:3.

[117] MM Dep. (Ex. 25) 22:15–18, 252:10–253:2. Defendants cannot dismiss the words of hotel employees as hearsay, as Defendants' employees' statements are admissions of a party opponent under Federal Rule of Evidence 801(d)(2).

[118] Ex. 111; Conner Dep. (Ex. 40) 29:24–25; 52:15–19.

[119] Ex. 91 at 1 ("One would think in his position, he would desire to be more helpful."); Ex. 88 (abatement notice).

avoid being spotted by law enforcement.[120] DP listened to a Smyrna security guard tell her trafficker about "where he could go [and] which rooms [were] good."[121]

The Buckhead location was similar. For example, RP testified that her traffickers relied on hotel staff to notify them if police were in the area.[122] And Michael Thomas testified that Jay Moyer told him to book suspected prostitutes in the back of the property, where they would be less visible to other guests.[123] Monica Hamilton, too, testified that at Buckhead, the prostitution activity was concentrated "on the back side as well for the girls to take care of their business, so to speak."[124] Michael Thomas even reported to Jay Moyer that the "head maintenance man at the property, has improper relations with" a guest "who is for a fact a prostitute."[125]

And at both locations, women recounted seeing hotel employees as "customers." After EH told two security guards at Smyrna that she was having sex for money, one of them kept a lookout for her to warn her if police were around, and both paid to have sex with her. [126] EH also had sex with a front desk employee, who would give her the

---

[120] MB Dep. (Ex. 9) 190:11–191:10; JD4 Dep. (Ex. 6) 104:24–106:18; *see also* DP Dep. (Ex. 7) 42:22–43:11.
[121] DP Dep. (Ex. 7) 42:21–24.
[122] RP Dep. (Ex. 10) 215:1–7, 297:24–298:23.
[123] Thomas Dep. (Ex. 14) 45:14–48:10.
[124] Hamilton Dep. (Ex. 41) 87:24–88:1.
[125] Moyer Dep. (Ex. 18) 258:16–259:23.
[126] EH Dep. (Ex. 8) 130:8–131:25, 141:16–142:2.

key to a room where he'd meet her to buy sex.[127] And once, he—or someone who sounded like him and worked at the hotel—called her room to warn her about police activity in the area.[128] Meanwhile, RP described having sex with three Buckhead workers who paid her traffickers.[129]

Testimony shows a level of familiarity between obvious traffickers, pimps and staff that supports an inference they felt welcome to use both hotels to sell sex. MM testified that Smyrna was always "home base to go back to" "because that's where" one of her traffickers "felt he was safe."[130] WK recalled, too, that Smyrna staff were very friendly with her trafficker and would even buy drugs from him.[131]

At Buckhead, meanwhile, both RK and TK recounted how, in between flagrantly selling his victims for sex, their shared trafficker would socialize with employees as if he were "very familiar" with them, saying things like, "appreciate you."[132] "He'd just flaunt it," TH testified.[133] RK recalls how, at some hotels, the trafficker wouldn't even get out of the car, but at Buckhead, "he would not only go inside and pay for the room when we'd first get to the hotel," he would also "hang out in the parking lots of these

---

[127] *Id.* at 148:12–153:15, 157:19–24, 152:11–16.
[128] *Id.* at 162:8–163:25.
[129] RP Dep. (Ex. 10) 215:2–7, 297:24–298:23.
[130] MM Dep. (Ex. 25) 230:19–22.
[131] WK Resp. to Rog. (Ex. 69) at 21.
[132] RK Dep. (Ex. 22) 270:11–21; *see also* TH Dep. (Ex. 23) 273:5–10, 278:18–19.
[133] TH Dep. (Ex. 23) 286:12–13.

24

hotels with other pimps."[134] TH testified that "[a]ll the pimps would hang out there" and would "often blare music outside."[135]

## B. Defendants operated the Smyrna and Buckhead Properties to maximize revenue from prostitution.

*First*, employee testimony shows that Defendants encouraged prostitution activity in exchange for increasing revenue. Vanessa Cole testified that when she raised concerns about prostitution at Smyrna to Regional Vice President Jay Moyer, he said, "yes, we understand we have to, you know, clean up the place, but we also need to sell rooms."[136] Later, Bob Patel responded to an employee's report that Varahi "[was] allowing too many prostitutes to stay here" not by telling them to leave, but by suggesting that prostitutes "stay in [their] room."[137] Forrest Castille testified similarly that conversations were "never ever … about prostitution" but "about revenue and trying to keep the customers happy."[138]

Tom McElroy, a former security director charged with responsibility for Red Roof's corporately managed locations, including Buckhead, testified to his perception that the company—and Jay Moyer specifically—prioritized revenue over safety and

---

[134] RK Dep. (Ex. 22) 269:1–14; *see also* TH Dep. (Ex. 23) 278:18–279:3.
[135] TH Dep. (Ex. 23) 278:18–279:3.
[136] Cole Dep. (Ex. 15) 27:3–5.
[137] Ex. 111.
[138] Castille Dep. (Ex. 19) 47:8–14. ("That was the only training I had.").

security. McElroy testified that there was no security budget during his 2013 tenure.[139] Although the safety and security department did eventually have funding, Greg Stocker testified that the 2022 budget was $20,000 a year.[140] By comparison, in 2018, Red Roof's marketing budget was "roughly 10–13 million."[141]

Defendants were rewarded for their singular focus on revenue. Red Roof's financial 30(b)(6) designee confirmed that the Smyrna property was a "top performer" within the system.[142] And Buckhead, too, outpaced its peers during the entire period for which Red Roof had financial data.[143] Indeed, all Defendants benefited from their emphasis on revenue at the expense of safety and security. At Buckhead, which was owned by RRI III during all of the relevant time,[144] RRI West collected a management fee derived from gross room revenue.[145] And at Smyrna, RRI West collected the same revenue-based fees during the time FMW owned the hotel and until Varahi bought the property on December 14, 2012.[146] Once Varahi became the franchisee, Red Roof Franchising began collecting fees, including fees based on gross room revenues.[147] Red

---

[139] McElroy Dep. (Ex. 44) 136:24–137:4, 55:10–55:20, 48:19–24 (no budget).
[140] Stocker Dep. (Ex. 28) 23:14-24.
[141] MacDonald Dep. (Ex. 36) 56:17-25.
[142] Park 30(b)(6) Dep. (Ex. 34) 92:11–93:1; Ex. 169 at 8.
[143] *Id.* at 92:20–93:5.
[144] *Id.* at 47:10-17, 55:8-22.
[145] *Id.* at  55:8-22, 84:6-13.
[146] Ex. 167; Park 30(b)(6) Dep. (Ex. 34) 84:6-13.
[147] B. Patel Dep. (Ex. 17) 176:18-177:4.

Roof Inns, Inc., in turn, earned revenue from those same fees Red Roof Franchising collected.[148] In short, the more rooms sold at each property, the more each Defendant benefited financially.

*Second,* employees at both locations testified that they did not receive any training on safety and security, prostitution, or sex trafficking. Michael Thomas, for example, testified that he received no training at the Buckhead property on guest safety, no training on identifying or preventing crime, and no training on identifying or addressing prostitution or sex trafficking.[149] Forrest Castille, who worked for both Red Roof Inns, Inc. and Varahi, likewise testified that he "never" received training at Smyrna regarding any safety, security, or prostitution.[150]

Beginning in August 2014, Red Roof did offer *some* sex trafficking training to *some* employees. But this training was available only to general managers and was not required at franchised locations.[151] None of the employees deposed who worked at the two hotels in this case ever received any training, though Red Roof offered a webinar in 2014 called "Preventing and Reacting to Child Sex Trafficking."[152] By January 2015, it was offered to other location employees but still not required for franchise-location

---

[148] Park 30(b)(6) Dep. (Ex. 34) 84:23-85:5.
[149] Thomas Dep. (Ex. 14) 24:10–25:17; *see also* Conner Dep. (Ex. 40) 28:9–18.
[150] Castille Dep. (Ex. 19) 117:8–13.
[151] Wehrle 30(b)(6) Dep. (Ex. 42) 118:16–119:3.
[152] Ex. 168; Werhle 30(b)(6) Dep. (Ex. 42) 114:5–7.

employees.[153] At no time was sex trafficking training offered in any language other than English,[154] something hotel industry expert Alan Tallis called "a failure."[155]

*Third*, Red Roof lacked a true anti-trafficking policy that told employees how to respond when confronted with guests it knew or suspected may be trafficking victims. As Tallis observed,

> [T]he anti-sex trafficking 'policy' for the Red Roof brand was functionally indistinguishable from its (eventual) training on the topic. The essence was, 'If you see something, say something.' But if the 'sex trafficking training' was the sex trafficking policy, there was no policy.[156]

Tallis opined that a policy should be available outside training and instruct employees "what to do when they 'see something,'" but Red Roof offered nothing "describ[ing] what to do and how to do it" beyond its annual training.[157]

*Fourth*, as Tallis also observed, for nearly half the time Plaintiffs were trafficked at these locations, the Red Roof Defendants had no corporate employee dedicated to safety and security.[158] For the almost 7-year period from November 2010 to May 2017,

---

[153] Wehrle 30(b)(6) Dep. (Ex. 42) 119:4–13.
[154] Wehrle 30(b)(6) Dep. (Ex. 42) 132:22–133:17.
[155] Expert Report of Alan Tallis (Ex. 140) at 22 (Owners should adopt viable, repetitive training programs to account for the limitations of the employment base.).
[156] *Id.* at 26 (citing Limbert Dep. 84:9–10 ("[The] policies and procedures of Red Roof Inn, again, I will refer you to the training.") quoting Limbert Dep. 85:4–10).
[157] Tallis Report (Ex. 140) at 26.
[158] Tallis Report (Ex. 140) at 2; Vittatoe Dep. (Ex. 43) 37:16–18, 120:20–22; McElroy Dep. (Ex. 44) 17:7–9; Limbert Dep. (Ex. 31) 273:2–274:1.

the safety and security director position was filled for just one year—by Tom McElroy in 2013. It was otherwise vacant. Tallis characterized this vacancy as "highly unusual for a system as large as Red Roof" and explained that "[w]ithout a dedicated safety and security officer, there was no designated employee to monitor and respond to criminal activity at any Red Roof property."[159]

*Fifth*, the Smyrna and Buckhead locations failed to adopt other common sense practices that expert (and lay) testimony established could make their properties less hospitable to traffickers. For example, though the properties maintained so-called "Do Not Rent" or "DNR" lists at the location level, employees at both Smyrna and Buckhead ignored them. Brenda Conner testified, for example, that Forrest Castille and Bob Patel allowed guests on the DNR list to continue to rent rooms at the Smyrna property, including Anthony Shivers, the trafficker whom Michele Sarkisian reported to Red Roof's C-Suite.[160] Likewise, Michael Thomas testified that he would place guests on the DNR at the Buckhead property, only to see them return because it was at the "manager's discretion as to if they're going to rent to them or not."[161] Monica Hamilton, the Buckhead security guard, also testified to staff renting to guests even

---

[159] Tallis Report (Ex. 140) at 27.
[160] Conner Dep. (Ex. 40) 61:22–62:14.
[161] Thomas Dep. (Ex. 14) 96:7–97:24.

after the guests were removed from the property.[162]

III. **Corporate employees also had direct knowledge of the prostitution and trafficking at the Smyrna and Buckhead Red Roof Inns.**

A. **Even after a human trafficking activist told Red Roof's C-Suite executives about the conditions at Smyrna, conditions got worse.**

In 2011, before the Smyrna property was sold to Varahi, internal Red Roof documents reported that the "area is increasingly seeing S&S [safety security] issues," including specifically "drugs and prostitution."[163] By 2012, emails show Vanessa Cole described Atlanta as a "hot spot" when reporting an incident involving prostitution at the Smyrna property to her supervisor, Jay Moyer.[164] But by 2015, knowledge of the conditions at Smyrna reached the top of the company.

On December 4, 2015, a "recognized hotel industry expert"[165] and former board member of ECPAT, an international anti-trafficking organization, Michele Sarkisian, called then-Red Roof President, Andy Alexander.[166] She specifically identified by name the same trafficker Bob Patel allowed on the property, Anthony  Shivers, reporting that he was still living in the manager's apartment, and she told Alexander

---

[162] Hamilton Dep. (Ex. 41) 143:1–144:9.
[163] Ex. 147 at 60.
[164] Ex. 124.
[165] Tallis Report (Ex. 140) at 14.
[166] Sarkisian Dep. (Ex. 29) 24:15–26:11; Sarkisian Aff. (Ex. 66) ¶¶ 3–9.

that "Shivers was trafficking women" there.[167] Sarkisian followed up with Alexander several times but never heard from him. Sarkisian did hear from then-general counsel, George Limbert, but Limbert was interested only in where Sarkisian got her information.[168] Limbert testified that because Sarkisian provided only "unverified information" and would not identify her source, the company did not credit her. Despite repeated requests, Red Roof produced no information about what action it took in response to Sarkisian's report,[169] instead claiming that the attorney client privilege and work product doctrine shield their actions from disclosure. But Red Roof cannot have it both ways: It cannot insist that it responded reasonably to Sarkisian's report *and* withhold information and resist discovery about its response based on privilege.

Whatever Red Roof did, conditions did not improve. Citing specific arrests in 2016 and 14 citations or arrests "in the previous 12 months," Cobb County sent Varahi a nuisance abatement notice in April 2017.[170] By August 2017, Cobb police contacted Vickie Lam, the franchise operations director responsible for Smyrna,[171] continuing to

---

[167] Sarkisian Aff. (Ex. 66) ¶¶ 7–8; Sarkisian Dep. (Ex. 29) 24:16–20. Both Jane Doe 1 and Jane Doe 2 were trafficked, at times, by Shivers. JD 1 Dep. Vol. 1 (Ex. 1), 9:4-10, 14:6-9, 40:22–41:13, 230:12–231:22, 79:1-11, 229:17–231:22; JD2 Dep. Vol. 1 (Ex. 3) 201:16–202:9.
[168] Sarkisian Dep. (Ex. 29) 32:1–5, 32: 5–10.
[169] Limbert Dep. (Ex. 31) 199:10–13, 213:1–19.
[170] Ex. 88; Stocker 30(b)(6) Dep. (Ex. 26) 173:4–10.
[171] Ex. 89; Ex. 91.

have concerns about the property.[172] And though there was a nuisance abatement plan in place and at least one meeting was held with Cobb County officials, the Red Roof Defendants' 30(b)(6) designee on this topic could not testify to the terms of the abatement plan, how many meetings occurred, or what occurred in those meetings.[173] No Defendant produced the plan in discovery.

**B.    A Red Roof Regional Vice President "joked" about "pimps and hos" at the Buckhead property.**

In 2013, Jay Moyer was "frustrated" with the Buckhead Inn's transition to a so-called "Plus+" property. Plus+ properties offered upgraded amenities, "from bath towels" to "providing a snackbox in the room." Concerned that Buckhead "would have a challenging time meeting the company expectations" for Plus+ properties,"[174] Moyer wrote, "well Mr. Moyer…what can you tell me about taking the Buckhead location to Plus+++++Plus status?? I'm going to say that **my pimps and hos** love them some snacks to go with their smokes."[175] Red Roof characterizes this as a "poor choice of words."[176] But even if a jury accepted Moyer's implausible explanation that he was quoting reviews, it would still confirm that Moyer, a Vice President for Defendant Red

---

[172] Stocker 30(b)(6) Dep. (Ex. 26) 190:8–10.

[173] *Id.* at 186:23–189:11, 190:21–191:19, 204:11–205:7.

[174] Moyer Dep. (Ex. 18) 212:15 (frustrated), 87:12–17 (amenities), 97:15–19.

[175] Ex. 95.

[176] *See, e.g.*, Doc. 148-1 at 6, *Jane Does 1–4 v. Red Roof Inns, Inc.*; Doc. 270-1 at 5 n.4, *WK v. Red Roof Inns, Inc.*

Roof Inns, Inc.,[177] was aware that the Buckhead property regularly rented rooms to suspected prostitutes and pimps.

Of course, Moyer did not need to quote customer reviews; he could have simply quoted location employees, who repeatedly reported prostitution to Moyer. For example, in December 2015, a general manager explained a guest complaint by saying, "This is a local guest that has male prostitute coming in out of the room."[178] In April 2015, when a woman called the customer service hotline and reported that her husband engaged an underage prostitute (aka "sex trafficking victim") at the location using Backpage, Moyer told the location manager only, "tread carefully on something [like] this. Let me know if you need help."[179] In October 2012, Michael Thomas told Moyer,

> [O]ur property has a high prostitution rate and although we try to curtail this [the general manager] prefers revenue so when people that we know for a fact are prostitutes or are on the do not rent list even in some cases [the general manager] will let them still rent rooms she says its at her discretion.[180]

In August 2012, after a manager reported "[throwing] a few more prostitutes off the property last night," Moyer cautioned that they should only remove guests if they

---

[177] Ex. 110.

[178] Ex. 138 at 2.

[179] Ex. 117 (emphasis in original).

[180] Ex. 93. Though Moyer responded to other statements in this email, like those regarding timing goals for housekeepers, he offered no response to this statement.

"KNOW that someone is soliciting."[181] And when Michael Thomas reported to Moyer guest complaints about "young girls" being sold for sex at Buckhead, Moyer suggested they be put in rooms on the backside of the hotel, away from the family-oriented guests who stayed in the rooms on the front side of the hotel.[182]

Moyer's own emails also undermine the suggestion that his "pimps and hos" email was an insincere joke. The same day he referred to "pimps and hos" at Buckhead—he used "local cliental" as a euphemism for "prostitution and drug dealers" and encouraged others, or himself, to use "local cliental or challenging cliental instead" of "prostitution and drug dealers."[183] And elsewhere, Moyer described Buckhead as a "challenging and high volume property"[184] and linked those "challenge[s]" to, among other things, "local clientele or transient clientele."[185]

### C. Sex trafficking, not just prostitution, was a problem known to the hotel industry and to Red Roof.

Expert testimony confirms that "the hotel industry was aware by the early 2000s that human trafficking posed a significant problem" in the industry.[186] By 2004, ECPAT had promulgated its Code of Conduct for the Protection of Children from Sex

---

[181] Ex. 118; Moyer Dep. (Ex. 18) 228:21–22 (identifying sender as manager).
[182] Thomas Dep. (Ex. 14) 40:6-41:16.
[183] Ex. 110.
[184] Ex. 171.
[185] Moyer Dep. (Ex. 18) 102:4–7.
[186] Tallis Report (Ex. 140) at 7.

Exploitation in Travel and Tourism, commonly known as "the Code."[187] Hotels started signing the Code that year, and by 2006, industry publications were discussing hotels' role in fighting human trafficking.[188] In 2010, the Department of Homeland Security launched a national public awareness campaign designed to educate "industry partners," among others, "to recognize the indicators of human trafficking and how to appropriately respond to possible cases."[189] In September 2011, the American Hotel and Lodging Association (AHLA) offered training to its members "who perform security functions at a property" including training on "Child trafficking/protection of children."[190] In 2012, AHLA launched a public training video on "Human Trafficking Awareness" to "help associates identify suspicious activity and provide them with instructions on how to proceed."[191]

Red Roof knew that trafficking was a known problem in the industry. In March 2012, Red Roof distributed anti-trafficking flyers produced by the Department of Homeland Security to its properties, including franchised locations, and requested that

---

[187] *Id.*

[188] *Id.* at 8.

[189] *Id.* at 8 (quoting Press Release, Secretary Napolitano Launches First of Its Kind Campaign to Combat Human Trafficking, U.S. Dep't of Homeland Security (July 22, 2010), https://www.dhs.gov/news/2010/07/22/secretary-napolitano-launches-first-its-kind-campaign-combat-human-trafficking).

[190] *Id.* at 20 (quoting https://www.hospitalitynet.org/news/4053008.html).

[191] *Id.* at 20–21 (quoting https://www.ahlei.org/product/human-trafficking-dvd/).

35

they post them "in the break room of their propert[ies]."[192] Testimony shows these flyers were posted specifically in the breakrooms at Smyrna and Buckhead.[193] And Red Roof experienced and knew of sex trafficking arrests at other Red Roof Inns nationally.[194] Red Roof's public relations firm circulated weekly press reports to Marina MacDonald and other marketing staff.[195] No fewer than 9 times over 5 years, they mentioned human trafficking activity at Red Roof hotels.[196] Also, MacDonald received Google alerts reporting another 4 incidents of human trafficking at Red Roof locations within the same timeframe.[197]

By July 2012, then-Red Roof President Andy Alexander had received an invitation to a hospitality law conference including a session from ECPAT titled "Mitigating Human Trafficking."[198] A number of industry and other publications

---

[192] Ex. 87 at 11.

[193] Moyer Dep. (Ex. 18) 169:7–17.

[194] Ex. 125 at 4 (Sept. 2013); Ex. 126 (Oct. 2013); Ex. 127 (Apr. 2014); Ex. 128 (Jun. 2014); Ex. 129 (Oct. 2015); Ex. 130 at 7 (Jan. 2016); Ex. 131 (May 2016), Ex. 132 at 8 (Jan. 2017), Ex. 133 at 3 (Jul. 2018).

[195] MacDonald Dep. (Ex. 36) 218:24–221:14. MacDonald was an employee of Defendant Red Roof Franchising, *id.* 57:19–23, but her testimony was that she "worked for the entire brand," *id.* at 46:7, and her work did not distinguish between corporately owned and independently franchised properties, *id.* at 59:14–21.

[196] In the examples listed above, the mention of forced commercial sex appeared in the face of the public relations firm report, as opposed to in the linked news story.

[197] Ex. 134 (2014); Ex. 135 (2016); Ex. 136 (2016); Ex. 137 (2018).

[198] Ex. 85.

Alexander received that year also discussed hotels' role in human trafficking.[199] And there were human trafficking arrests at Red Roof locations reported to Alexander—including by his own wife—that same year.[200]

Further, the Red Roof Defendants' 30(b)(6) witness on security topics, Greg Stocker, testified that Red Roof has known since at least 2010 that prostitution and sex trafficking share indicators, including a large number of condoms in a room, scantily clad women loitering, and heavy foot traffic in and out of rooms, with visitors staying for only short periods.[201] In fact, no fewer than four Red Roof corporate employees testified that sex trafficking and prostitution have common indicators and are difficult to distinguish.[202] As shown above and in Argument, Part II.C, Plaintiffs at the Red Roof hotels exhibited these very signs and more.

---

[199] Ex. 148 ("Hotel & Lodging Executive Briefing"); Ex. 116 ("recap" of meeting where Department of Homeland Security representative spoke about hotels' efforts "to prevent human trafficking"); Ex. 83 ("Calfee Report on Ohio Government," reporting on then-Governor John Kasich's State of the State address, announcing a "focus[] on eliminating human trafficking").

[200] Ex. 84; Ex. 86.

[201] Stocker 30(b)(6) Dep. (Ex. 26) 36:25–39:15

[202] McElroy Dep. (Ex. 44) 26:24–28:9; Limbert Dep. (Ex. 31) 80:3–24; Stocker 30(b)(6) Dep. (Ex. 26) 36:25–39:15; Vittatoe Dep. (Ex. 43) 83:14–20.

## ARGUMENT AND CITATION TO AUTHORITY

**I.    Defendants violated Georgia RICO by catering to traffickers, pimps, and prostitutes.**

To establish a Georgia RICO claim, Plaintiffs must show that (1) Defendants acquired or maintained an interest or control of money, O.C.G.A. § 16-14-4(a); (2) through a pattern of racketeering activity, *id.* § 16-14-3(4); and (3) the racketeering activity harmed the Plaintiffs. Defendants do not challenge the first element, nor could they. The Defendants obtained money from the operation and rental of rooms at the Smyrna property, the Buckhead property, or both.[203]

Defendants challenge the remaining elements with a scattershot effort, arguing that they did not know of and were not directly involved in, any pattern of racketeering activity. Even if they did, say Defendants, Plaintiffs can't recover because they either weren't sufficiently targeted by the pattern or they participated in the crimes, ignoring that Plaintiffs were sold for sex against their will. And the Red Roof Defendants assert that Plaintiffs lack evidence of a RICO conspiracy. Defendants are wrong on all counts.

---

[203] Ex. 167; Park 30(b)(6) Dep. (Ex. 34) 55:8-22, 84:6-13 (RRI West revenue from Buckhead); Park 30(b)(6) Dep. 84:6-13 (RRI West revenue from Smyrna); B. Patel Dep. (Ex. 17) 176:18-177:4 (Red Roof Franchising revenue from Varahi); Park 30(b)(6) Dep. (Ex. 34) 84:23-85:8 (Red Roof Inns, Inc. revenue from Red Roof Franchising); Park 30(b)(6) Dep. (Ex. 34) 47:10-17, 55:8-22 (RRI III owner); Park 30(b)(6) Dep. 84:6-13 (FMW RRI NC owner). *See* Plaintiff's Claim Chart, Ex. 48.

## A.     Defendants engaged in a pattern of racketeering activity.

"Racketeering activity" means to "commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit" certain enumerated crimes known as predicate acts. *Id.* § 16-14-3(5)(A). A pattern requires just two predicate acts. *Id.* § 16-14-3(4)(A); *Dorsey v. State*, 279 Ga. 534, 540 (2005).[204] The burden of proof for predicate acts in a civil RICO action is preponderance of the evidence. *Williams General Corp. v. Stone*, 279 Ga. 428, 429 (2005) ("*Williams I*") (rejecting clear and convincing evidence burden as "at odds with" the RICO Act's purpose: "to provide compensation to private persons injured or aggrieved by reason of any RICO violation.").[205]

Moreover, Plaintiffs may show that Defendants are liable for predicate acts not just for direct participation but also as parties to these crimes. "Every person concerned in the commission of a crime is **a party thereto** and may be charged with and convicted of commission of the crime," including anyone who "intentionally aids and abets" or

---

[204] Civil RICO liability does not require an underlying criminal conviction, because "racketeering activity consists not of acts for which the defendant has been convicted, but of acts for which he could be." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 488 (1985); *see Williams Gen. Corp. v. Stone*, 279 Ga. 428, 430–31 (2005) (citing *Sedima* favorably and explaining that "[b]ecause the Georgia RICO Act was modeled after the federal statute, this Court has found federal authority persuasive in interpreting the Georgia RICO statute").

[205] O.C.G.A. § 16-14-2(b) (the statute "shall be liberally construed to effectuate the remedial purposes").

"intentionally advises, encourages, hires, counsels or procures another to commit the crime." O.C.G.A. § 16-2-20(a), (b)(3), (4). Thus, "a participant in a crime may be convicted of the crime without having directly committed the crime." *Coggins v. State*, 275 Ga. 479, 480 (2002); *Dorsey,* 279 Ga. at 541; *Whaley v. State,* 343 Ga. App. 701, 704 (2017) (everything done by a co-conspirator in furtherance of their common purpose is done by all of them).

In *Clemmons v. State*, for example, the Court of Appeals affirmed a conviction for aggravated child molestation of a pimp who was a party to that crime. 361 Ga. App. 666 (2021). The conviction relied on specific sex acts between the victim and a buyer, acts that the defendant arranged but in which he did not directly participate. *Id.* But the evidence showing that the defendant was "present at the scene of the crime, had knowledge the crime was to be committed, and approved of the planned commission of the crime" was sufficient to support the conviction as party to the crime under O.C.G.A. §16-2-20. *Id.* at 670; *see also State v. Ulbrich*, --- Ga. App. ---, 870 S.E.2d 859 (2022) (affirming conviction of a licensed medical doctor for practicing unlicensed medicine because he assisted a person who practiced medicine without a license).

To be sure, conviction as a party to the crime still requires "[c]ommon criminal intent with the direct perpetrators." *Fitts v. State,* 312 Ga. 134, 142 (2021). But "[a] jury may infer a common criminal intent from the defendant's presence,

companionship, and conduct with other perpetrators before, during and after the crimes." *Id.*; *Platt v. State,* 335 Ga. App. 49, 53 (2015) (holding that a defendant with knowledge of the crime who shared the principal's criminal intent is an aider and abettor); *see also Cox v. Adm'r U.S. Steel & Carnegie,* 17 F.3d 1386, 1398 (11th Cir.) (one who aids and abets two predicate acts can be civilly liable under RICO). Thus, whether a defendant is a party to a crime is generally a question for the fact finder. *Coggins,* 275 Ga. at 480.

As detailed below, evidence shows that Defendants violated O.C.G.A. § 16-6-10 by "keeping a place of prostitution" each time they rented a room to any Plaintiff, trafficker, or other person for prostitution at the Smyrna or Buckhead Inns. Indeed, Defendants directly engaged in that crime and assisted others who did the same. Likewise, every act of assistance by Defendants' employees to every trafficker, pimp, or prostitute made Defendants parties to the crimes of trafficking for sexual servitude, O.C.G.A. § 16-5-46, pimping, *id.* § 16-6-11, and prostitution, *id.* These acts, supported by the record, show that Defendants engaged in a pattern of racketeering activity. And the record is replete with evidence that Defendants profited from this pattern as well.

### 1.   *Defendants were keeping a place of prostitution.*

A person keeps a place of prostitution when, "having or exercising control over the use of any place or conveyance which would offer seclusion or shelter" they

"knowingly grant[] or permit[] the use of such place for the purpose of prostitution." O.C.G.A. § 16-6-10.[206] The crux of keeping a place of prostitution is the practice of prostitution. *Coleman v. State,* 5 Ga. App. 766 (1909). Still, "conviction may be had … without proof of any particular act of fornication or adultery." *Fitzgerald v. State,* 10 Ga. App. 70, 77 (1911). And evidence that an innkeeper provided assistance to sex workers using, for example, a buzzer to alert guests of police at the hotel, supports a conviction for the crime. *Peters v. State*, 72 Ga. App. 157, 158 (1945)*; see Shealy v. State,* 142 Ga. App. 850, 850 (1977) ("[I]t is necessary to show only that the accused contributed to or aided, directly or indirectly, in maintaining and keeping a lewd house."); *Brannan v. State*, 43 Ga. App. 231 (1931); *Ward v. State,* 22 Ga. App. 786 (1918).

*First*, despite Defendants' insistence that they knew nothing and saw nothing, direct evidence from Plaintiffs and numerous hotel employees shows that acts of prostitution undeniably took place at the Smyrna and Buckhead properties. Indeed, as described above and in more detail in the Plaintiffs' Statement of Disputed Facts, Plaintiffs collectively testified to being sold for sex for thousands of nights across about

---

[206] Defendants exercised control of the hotel. *See* Ex. 50. Defendants do not dispute their hotels offer "seclusion and shelter" in individual hotel rooms, indeed, it is a fact Defendants have used to defend their ostensible lack of knowledge about what goes on behind closed doors.

9 years at both locations. And hotel employees admitted to not just observing prostitution, but in some cases, knowingly renting rooms to prostitutes.

- Forrest Castille testified that there was "never a minute that [he] worked at Red Roof Inn … that there was not prostitution going on."[207]
- Another Smyrna front desk employee reported to Varahi owner, Bob Patel, that they were "allowing too many hookers to stay [there]."[208]
- Smyrna housekeeper Brenda Conner saw "100 buyers day."[209]
- At Buckhead, Michael Thomas testified to a "revolving door" or pimps and prostitutes, and Vanessa Cole described prostitution as a "consistent problem" that she reported "up to the chain."[210]
- Monica Hamilton described the prostitution at Buckhead saying, "There was no way you could not know."[211]
- The two security guards at Smyrna and other employees who visited Plaintiffs EH (Smyrna) and RP (Buckhead) to purchase sex also knew about prostitution at those hotels.[212]

And of course, there's Vice President Jay Moyer who said of the Buckhead location, "my pimps and ho's love them some snacks to go with their smokes."[213]  The scope of this conduct far exceeds the two predicate acts required to show a pattern.

But there is more. The record shows Defendants also actively assisted traffickers and pimps. Plaintiffs testified that Forrest Castille, "Barry" and other employees acted

---

[207] Castille Dep. (Ex. 19) 42:22-43:4.
[208] Ex. 111.
[209] Conner Aff. (Ex. 67) ¶ 11.
[210] Cole Dep. (Ex. 15) 30:21–31:1.
[211] Hamilton Dep. (Ex. 41) 102:25-103:17; 142:17–23.
[212] *See, e.g.*, EH Dep. (Ex. 8) 130:8–131:25, 141:16–142:2 (Smyrna); RP Dep. (Ex. 10) 215:2–7, 297:24–298:23 (Buckhead).
[213] Ex. 95.

as lookouts for traffickers and pimps, calling to warn traffickers and prostitutes that police were at the hotel or when to slow the number of buyers coming and going from a room.[214] Employees helped prostitutes avoid detection from police by putting them in rooms in the back of the building, at both Smyrna and Buckhead.[215] All of this mirrors *Peters v. State*, where the Court affirmed an innkeeper's conviction for keeping a place of prostitution and where, evidence showed, the innkeepers used a buzzer to alert guests to police at the hotel. 72 Ga. App. at 158.

Defendants make two meritless arguments to avoid liability based on these predicate acts of keeping a place of prostitution. *First*, Varahi says there is no evidence of "actual knowledge." That's wrong on the facts, as multiple Varahi employees testified to their knowledge that the hotel was renting rooms for the purpose of prostitution. And in any case, "actual knowledge" isn't required. The one case Varahi cites for its argument never uses that term, and instead simply confirms (unremarkably) that to be guilty of keeping a place of prostitution, one must knowingly and intentionally commit the crime. *Anh v. State,* 279 Ga. App. 501, 503 (2006). But it is well-established that the knowledge element for a criminal conviction includes willful

---

[214] Background, Part II.A., B.

[215] MB Dep. (Ex. 9) 190:11–191:10; JD4 Dep. (Ex. 6) 104:24–106:18; *see also* DP Dep. (Ex. 7) 42:22–43:11; Thomas Dep. (Ex. 14) 45:14–48:10 (testifying Moyer said to move prostitutes to back of building).

blindness. As the Georgia Court of Appeals held in *Fitzgerald,* a defendant "cannot shut his eyes to what was going on around him, for the purpose of avoiding knowledge, and then defend on the ground of his lack of knowledge." 10 Ga. App. at 77.

*Second*, Defendants challenge the evidence as circumstantial. But Georgia law is clear: "Criminal intent may be inferred from conduct before, during and after the commission of a crime." *Platt v. State,* 335 Ga. App. 49, 53 (2015). Knowledge, too, "may be shown by direct proof, or inferentially by circumstances." *Basil v. State,* 22 Ga. App. 765 (1918), and "[w]hen considering circumstantial evidence, jurors are entitled to draw reasonable inferences based on their own common-sense understanding of the world." *Fitts*, 312 Ga. at 142. That's what happened to support the conviction in *Coleman*, where witnesses observed "women walking about the house, rather loosely dressed" and "men were seen to frequent the place by day and by night." 5 Ga. App. 767-68; *see also Fitzgerald*, 10 Ga. App. at 70 (affirming conviction based on circumstantial evidence of individual "lewd" women at defendant's hotel on separate occasions in such numbers that the innkeepers must have known the hotel was being used for prostitution).

Like in *Coleman* and *Fitzgerald*, in addition to direct evidence, mountains of circumstantial evidence permit a jury to infer Defendants' knowledge and intent to

grant use of their hotels for prostitution. Again, both hotels hosted an open sex trade.[216]

Witnesses consistently describe women and girls in various states of dress ("no clothes on"[217] to "very little clothing"[218] high heels, short shorts,[219] "negligee"[220]). Plaintiffs and hotel employees describe a steady stream of men making brief visits to hotel rooms.[221] This all happened under the watchful eye of flashy pimps, who waited outside doors or in the parking lot,[222] and while housekeepers replaced soiled and sometimes bloody towels and linens and emptied trash cans brimming with condoms.[223] In other words, "certain transactions between men and women" were apparent to employees, "which ought to have informed any reasonable man that [the property] was being used for purposes of prostitution"—the very same evidence supporting a conviction in *Fitzgerald*. 10 Ga. App. at 77.

What's more, at Smyrna specifically, guests were greeted by a prominently displayed sign reading, "No refunds after 15 minutes."[224] Though Varahi denied any

---

[216] *See supra,* Background, Part I.
[217] JD3 Dep. (Ex. 5) 160:20–161:2.
[218] Conner Aff. (Ex. 67) ¶ 7.
[219] AF Dep. (Ex. 24) 242:8–14, 247:17–21, 248:19–24.
[220] Thomas Dep. (Ex. 14) 103:16–17.
[221] JD2 Dep. Vol. 1 (Ex. 3) 199:13–200:7; DP Dep. (Ex. 7) 48:6–8, 296:22–297:2.
[222] Conner Dep. (Ex. 40) 35:6–12.
[223] JD3 Dep. (Ex. 5) 162:16-19; JD1 Dep. Vol. I (Ex. 1) 194:16–17; TH Dep. (Ex. 23) 275:19–276:1.
[224] B. Patel Dep. (Ex. 17) 71:13–17.

connection between the sign and prostitution, one guest inferred the sign's meaning, writing, "Turned out to be nothing but a hotel for hookers to score. A sign in the lobby said 'no refunds after 15 minutes.'"[225] A jury would be entitled to do the same. *See Whaley v. State,* 343 Ga. App. 01, 704 (2017) (affirming Georgia RICO conspiracy conviction where jury was free to reject defendant's disclaimer of knowledge of unlawful activity).

In sum, all fifteen Plaintiffs testified that they were sold for sex at Defendants' hotels. The frequency and number of people being sold for sex at the Defendants' hotels and the totality of the circumstances at both hotels support the inference that Defendants knew of and intended to keep a place of prostitution.

### 2.   *Defendants' assistance makes them liable for sexual servitude, pimping, and prostitution as parties to the crime.*

Defendants insist that they were not "directly involved" with trafficking, pimping, or prostitution, and so they cannot be liable under RICO. But Plaintiffs' claims do not require that employees directly sold any Plaintiff for sex; Defendants' help to those who did—making them "parties to the crime"—is sufficient under Georgia law. O.C.G.A. § 16-2-20(a); *Coggins*, 275 Ga. at 480.

Evidence that multiple hotel employees acted as lookouts is itself sufficient to

---

[225] B. Patel Dep. (Ex. 17) 71:13–17; Ex. 121.

create a fact question on Defendants' assistance to and aiding and abetting of traffickers, pimps, and prostitutes to establish predicate acts under O.C.G.A. §§ 16-5-46 (sexual servitude), 16-6-11(pimping), 16-6-9 (prostitution).[226] "A defendant who accompanies a co-defendant to the crime scene and serves as a lookout also can be convicted as a party to the crime." *Platt,* 335 Ga. App. at 54; *Dixson v. State,* 277 Ga. App. 656, 659 (2006) (defendant aided and abetted the commission of the crime by acting as a lookout); *Brown v. State,* 224 Ga. App. 241 (1997) (same); *Tanner v. State*, 230 Ga. App. 77, 77–78 (1997) (same).

But acting as lookouts is not the only evidence of Defendants' assistance.[227] As the Court reaffirmed in *Fitts*, evidence of "presence, companionship, and conduct" with the perpetrators may circumstantially establish knowledge and intent. *Fitts*, 312 Ga. at 142. For example, Varahi employee Conner testified about a known pimp who continuously rented room 201 and who would hang out in the front office while the women he pimped were seeing johns.[228] Plaintiff DP testified that a Smyrna security guard advised her trafficker of the best rooms.[229] Both hotels accommodated the sex trade by offering rooms in the back side of the hotel, where the activity was less visible

---

[226] *See supra*, Background, Part II (staff catered to pimps and prostitutes).
[227] *Id.*
[228] Conner Dep. (Ex. 40) 35:6–12, 35:16–18.
[229] DP Dep. (Ex. 7) 43:22–44:11.

48

to police and others.[230] The eyewitness testimony of Plaintiffs and hotel employees discussed above in Background, Part II.A describes the presence and companionship discussed in *Fitts*, establishing that hotel employees had continual relationships with traffickers who returned again and again to Defendants' hotels because the traffickers knew the hotels would allow it.

Defendants' arguments as to these predicate acts are misguided. *First*, Varahi relies on *J.C. v. I Shiri Khodlyar, LLC*, to argue that Plaintiffs must show a "direct association between the defendant and the person committing the commercial sex acts" to establish the predicate act of pimping, O.C.G.A. § 16-6-11, but the court in that case did not address (and no one argued) liability as party to the crime. 2022 WL 4482736, No. 1:22-CV-00844-SEG, *9 (N.D.Ga. Aug. 29, 2022). To the extent the Court's holding suggests that a "direct association" is required to establish party-to-the-crime liability, that's inconsistent with binding Georgia precedent. *Coggins*, 275 Ga. at 480.

*Second*, Defendants insist that they cannot be liable for these predicate acts because they were unaware of sex trafficking, as opposed to what they describe as "voluntary" prostitution. That's wrong on the law and the facts. As to the law, Defendants offer an antiquated and overly narrow view of what constitutes trafficking.

---

[230] MB Dep. (Ex. 9) 190:11–191:10 (Smyrna); DP Dep. (Ex. 7) 43:22–44:11 (Smyrna); JD4 Dep. (Ex. 6) 104:24–106:18 (Smyrna); 2022-02-02 Thomas Dep. (Ex. 14)45–48 (Buckhead); Hamilton Dep. (Ex. 41) 88:3–19 (Buckhead).

First, a minor sold for sex is always a trafficking victim. O.C.G.A. § 16-5-46(a)(8)((B).

And second, Georgia law on trafficking for sexual servitude expansively defines

coercion and deception. In *Lemery v. State*, for example, the defendant challenged his

conviction for trafficking an 18-year-old victim, arguing that the victim was "his adult

boyfriend" who "willingly prostituted himself in order to maintain the defendant. 330

Ga. App. 623, 623 (2015). Affirming the conviction, the court held Lemery "used

coercion and deception to overpower the victim's will," employing tactics like

promises of love and affection and exploiting the victim's financial dependence, need

for food and shelter, and the ultimate threat of homelessness to leave the victim feeling

"hypnotized" and "brainwashed." *Id.* at 627-28. The jury was authorized to infer from

the totality of the circumstances that the victim, "though legally an adult, was uniquely

vulnerable to Lemery's coercive scheme to transform him from a boyfriend into a

prostitute." *Id.* at 628. In so doing, the court noted that "the jury should evaluate all of

the circumstances surrounding the alleged acts of trafficking, including the victim's

vulnerabilities and any inequalities of power between the victim and the trafficker in

determining whether the victim was coerced." *Id.* at 628 n.5.

*Lemery* teaches that while trafficking may involve overt signs of force, it may

also involve other, perhaps more subtle signs of coercion and deception. This record

contains both. Forrest Castille watched girls being beaten "like they were men" at

Smyrna,[231] and Vanessa Cole testified about young girls who never made eye contact,[232] while Plaintiffs described physical injuries, beatings in the parking lot, and audible fights that took place on hotel property. And as described above in Background Part II.A–C and below in Argument Part II.C, the record is replete with signs of pervasive prostitution that Red Roof's own general counsel and three other employees admit are also signs of trafficking.[233]  And adequately trained employees would have known enough to recognize the ever-present signs of forced or coerced commercial sex. This evidence is sufficient to draw the inference that Defendants knew *trafficking* was occurring.

Contrary to Defendants' suggestions, it is simply immaterial on summary judgment that some Plaintiffs did not ask for help, call the police, disclose they were being held against their will, or expressly tell employees that they were being actively trafficked for sex. Nor does it matter whether, at some other point, a plaintiff "voluntarily engaged in prostitution," as Varahi contends. None of these facts, even if true, preclude a jury finding that Plaintiffs were trafficked. "Victims of sex trafficking may make decisions that look voluntary at times due to the incredible weight of

---

[231] Castille Dep. (Ex. 19) 26:20–27:13.

[232] Cole Dep. (Ex. 15) 37:4–39:5.

[233]  McElroy Dep. (Ex. 44) 26:24–28:9; Limbert Dep. (Ex. 31) 80:3–24; Stocker 30(b)(6) Dep. (Ex. 26) 36:25–39:15; Vittatoe Dep. (Ex. 43) 83:14–20.

coercion and force upon them." *United States v. Carson*, 870 F.3d 584, 591 (7th Cir. 2017). Georgia Courts have affirmed criminal convictions for trafficking in cases involving similar facts. *Lemery,* 330 Ga. App. at 626; *Ferguson v. State,* 335 Ga. App. 862, 864 (2016) (affirming conviction where evidence showed victim had child with trafficker, passed out fliers, posted ads on craigslist, and helped recruit other girls); *Moore v. State,* 354 Ga. App. 145, 153 (2020) (affirming conviction where victim testified she did what she had to do to survive, including exchanging sex for money). A wealth of evidence allows a jury to infer Defendants' knowledge of trafficking at the Smyrna and Buckhead hotels, including Defendants' own admissions that they saw evidence of trafficking—not just sex work.

### B. Defendants' actions led directly to Plaintiffs' injuries.

Contrary to the Defendants' contentions, the evidence shows a direct connection between Defendants' predicate acts and Plaintiffs' injuries that resulted from their trafficking and exploitation at Defendants' hotels. This case is not a close call on proximate cause. Proximate cause in civil RICO is a flexible concept, ill-suited to a rigid rule dictating the result in every case. *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 654 (2008). The central question a court must ask is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451*,* 461 (2006); *Wylie v. Denton*, 323 Ga. App. 161, 166 n.7 (2013) (federal

authority is persuasive on the issue of proximate cause).

Georgia law provides  a civil cause of action to "any person who is injured by reason of a violation" of Georgia RICO. O.C.G.A. § 16-14-6(c). And "there is no requirement that plaintiff suffer direct harm from each and every alleged predicate act introduced." *InterAgency v. Danco,* 203 Ga. App. 418, 424 (1992); *S. Intermodal Logistics, Inc. v. D.J. Powers Co*., 10 F.Supp.2d 1337, 1354 (S.D. Ga. 1998) ("a Georgia civil RICO plaintiff does not have to show injury from *every* predicate act alleged, just "*a* predicate act"). It is the pattern that must be shown. *InterAgency,* 203 Ga. App. at 42. The facts of this case leave little doubt that Defendants' actions led directly to Plaintiffs' injuries.

Defendants erroneously rely on *Wylie v. Denton* to argue that the connection between their predicate acts and Plaintiffs' injuries is too attenuated because the injuries weren't "the direct result of a predicate act targeted toward" them. 323 Ga. App. 161, 166 (2013). But contrary to Defendants' contention, *Wylie* does not hold that a RICO defendant is liable only if it specifically targets the plaintiff as its intended victim. Instead, *Wylie* reasoned that the plaintiff must be a member of the class of victims targeted by the predicate acts. In *Wylie*, the pattern of racketeering—a scheme to embezzle from a construction company perpetrated by a company employee and assisted by a bank manager—targeted the construction company, not bank employees.

53

*Id.* at 163. Thus, bank employees who were fired after the scheme came to light could not sue for wrongful termination. *Id.* The scheme was not directed towards employees generally, so the bank employees' loss of their jobs was too remote an injury to establish proximate cause. *Id.* at 169; *see also Nicholson v. Windham*, 257 Ga. App. 429, 430 (2002) (employee fired from law firm not directly injured by law firm's operation of "real estate transaction closing mill");[234] *Morast v. Lance*, 807 F.2d 926, 933 (11th Cir. 1987) (employee fired for reporting bank's illegal scheme not directly injured by its violation of banking regulations).

By contrast, here, Plaintiffs were among the class of people targeted by Defendants' violations. It is hard to imagine any party who suffered a more direct injury from keeping a place of prostitution than the Plaintiffs who were sold for sex through force, fraud, coercion and deception. Evidence in Background Part I.A., II.B, and Argument Part I.A., establishes a direct nexus between Defendants' decision to profit from prostitution and Plaintiffs' injuries. Importantly, each Plaintiff alleges that she was sold for sex multiple times and stayed at least one night at each Red Roof hotel for which she asserts a claim. That evidence is more than sufficient to show each Plaintiff

---

[234] Defendants also rely on *Gentry v. Volkswagen of America, Inc.,* 238 Ga. App. 785 (1999), which required a plaintiff asserting Georgia RICO claim based on mail wire fraud predicate acts to have personally relied on alleged misrepresentation. *Id.* at 791. But the predicate act of fraud is targeted towards one who will be duped by the fraud. Here, the predicate acts target the women sold for sex.

was injury by *at least one* predicate act, and to establish proximate cause under Georgia

RICO. *See J.C.*, 2022 WL 4482736, at *9 (like allegations support proximate cause).

### C. Defendants engaged in a RICO Conspiracy.[235]

The evidence shows that Defendants shared a common objective of making

money through prostitution, which is the essence of a conspiracy to violate Georgia

RICO. O.C.G.A. § 16-14-4(c). All Defendants made money through the rental of rooms

for prostitution. In fact, both Smyrna and Buckhead rated as "top performers"

financially.[236] And the more money those hotels made, the more went into the Red Roof

Defendants' pockets.[237] An agreement to the overall objective of making money

through prostitution violates RICO. *United States v. Pipkins,* 378 F.3d 1281, 1291 (11th

Cir. 2004), *vacated on other grounds by* 544 U.S. 902. The evidence here creates a fact

question, at least.

Red Roof Defendants argue that they did not commit any overt act, but as

members of conspiracies to violate RICO, Defendants are responsible for all acts

---

[235] Varahi did not move for summary judgment on Plaintiffs' RICO conspiracy claim. Notably, a Georgia RICO conspiracy violation does not depend on the existence of a substantive violation. In fact, a defendant can be guilty of a Georgia RICO conspiracy violation without any substantive violation. *Cotman v. State,* 342 Ga. App. 569, 583–84 (2017).

[236] Park 30(b)(6) Dep. (Ex. 34) 92:11–19; Ex. 169 at 8.

[237] Background, Part II.B.; Park 30(b)(6) Dep. (Ex. 34) 47:10-17, 55:8-22; 84:6-13; 84:23-85:5; Ex. 167.

committed in furtherance of the criminal endeavor. *Pasha v. State*, 273 Ga. App. 788, 790 (2005). Evidence shows that Defendants conspired with traffickers, pimps, and prostitutes to keep a place of prostitution and to aid and abet trafficking, pimping, and prostitution. A person engages in a RICO conspiracy "if they knowingly and willfully join a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts." *Cotman,* 342 Ga. App. at 585. There is "no requirement" that a defendant "personally commit[] the underlying predicate offenses," only that a member of the conspiracy do so. *Pasha*, 273 Ga. App. at 788.

No express agreement between the Red Roof Defendants and Plaintiffs' traffickers is required, contrary to the Defendants' argument. A conspiracy "may be a mere tacit understanding between two or more people that they will pursue a particular criminal objective." *Akintoye v. State*, 340 Ga. App. 777, 781 (2017). A tacit understanding may be shown by circumstantial evidence or "by inference as well as deduction from conduct." *Brown v. State,* 177 Ga. App. 284, 295 (1985). Background, Part II, above, shows evidence of the hospitable environment Defendants cultivated for prostitution and trafficking at Smyrna and Buckhead. A tacit understanding may be inferred based upon the nature of the acts done, the parties' relationship, their interests, and other circumstances. *Studivant v. State,* 309 Ga. 650, 651 (2020).

Even when news of trafficking reached Red Roof's President, nothing changed.

A jury could conclude that Defendants saw and received complaints of criminal activity but took no effort to investigate or stop it as they were clearly profiting from it. This supports the existence of a conspiracy to violate RICO and the inference that Defendants knowingly participated in a conspiracy. *United States v. Browne,* 505 F.3d 1229, 1265 (11th Cir. 2007) (affirming conspiracy conviction where defendant failed to respond to complaints, deflected requests for information, disregarded advice to establish internal controls, failed to take prompt measures when learned of theft); *see also, United States v. Shepkaru,* 191 F.App'x 893, 897 (11th Cir. 2006) (evidence that defendant ignored calls from victims authorized jury to conclude she knowingly participated in conspiracy to defraud them).

### D. Defendants may be directly liable because corporations are "persons" under Georgia RICO.

Defendants insist they are merely corporate defendants, who are, at worst, passive instrumentalities to the crime at their hotels or, at best, victims themselves. That Defendants operated brothels under the guise of legitimate hotels in no way limits their liability under Georgia RICO. Since RICO's passage, defendants have tried to narrow RICO's scope to immunize "legitimate businesses" from civil liability. This case is no exception. But legitimate businesses "enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 499 (1985).

57

The Red Roof Defendants ignore controlling precedent to argue that a corporation may only face RICO liability if it is "a party to or involved in the commission of the employee-perpetrator's predicate crimes."[238] This corporation-agent concept comes from O.C.G.A. § 16-2-22(a)(2), which, in relevant part, provides that a corporation may face criminal liability only if its board or a manager "authorized, requested, commanded, performed, or recklessly tolerated" the crime. But the Georgia Supreme Court in *Williams General Corp. v. Stone* specifically "decline[d]" to apply this statute to a civil RICO claim. 280 Ga. 631 (2006) ("*Williams II*"). Instead, a corporation is liable under civil RICO for the acts of its agents just as any other person would be. *Id.* And as detailed above, Defendants, through their agents, operated the Smyrna and Buckhead hotels and actively participated in, assisted, facilitated and otherwise helped make prostitution profitable—for pimps, prostitutes, and for themselves.[239] *See Reaugh v. Inner Harbour Hosp.,* 214 Ga. App. 259, 264 (1994).

Defendants' reliance on *Duvall v. Cronic* is unavailing. 347 Ga. App. 763, 775 (2018). There, the Georgia Court of Appeals relied on *Clark*, a 1998 case applying the now-abrogated, pre-*Williams II* understanding of corporate liability for civil RICO. *Id.* (citing *Clark Sec. Life Ins. Co.*, 270 Ga. 165, 167–68 (1998)). The Court of Appeals in

---

[238] *See, e.g.*, *W.K.*, Doc. 270-1 at 24 and *Jane Doe*, Doc. 148-1 at 34–35.
[239] Park 30(b)(6) (Ex. 34) 92:11–93:1; Ex. 169.

*Duvall* ignored that the Supreme Court, in *Williams II*, expressly "disapprove[d]" *Clark*'s incorporation of O.C.G.A. § 16-2-22, saying the incorporation "adds confusion to a straightforward interpretation of the RICO statute." 280 Ga. at 633. In any case, this corporate-agent concept did not even matter in *Duvall* because, there, the plaintiff satisfied even the heightened standard of O.C.G.A. § 16-2-22. 347 Ga. App. at 790. Thus, the *Duvall* language is dicta.

### E. A victim cannot be an accomplice to her own sexual servitude.

Seizing solely on language from an inapposite Nevada decision interpreting Nevada RICO, Defendants argue that Plaintiffs' participation in prostitution prevents them from recovering under Georgia RICO. *Allum v. Valley Bank,* 849 P.2d 297, 280 (Nev. 1993). But Defendants' argument completely ignores the well-developed record evidence, described in Argument, Part II.B., that every single plaintiff testified that she is a victim of trafficking—evidence that creates *at least*, a fact question on that issue. Georgia law further undermines Defendants' argument because "[a] person shall not be guilty of a sexual crime [including prostitution] if the conduct upon which the alleged criminal liability is based was committed by an accused who was" under 18 years old, or "[a]cting under coercion or deception while being trafficked for sexual servitude." O.C.G.A. § 16-3-6; *see also* O.C.G.A. § 16-3-6 (a)(3) (defining "Sexual Crime"). Because the Court must, at this stage, credit Plaintiffs' testimony that they

were trafficked, Plaintiffs cannot be guilty of any sex crime, including prostitution. Defendants' do "not identify any legal authority for the underlying premise that a person can be an accomplice to her or her own sexual servitude." *See Ferguson,* 335 Ga. App. at 864-65.[240]

## II.   The extensive record establishes a jury question on the TVPRA claims.

Each Plaintiff also brings a TVPRA "beneficiary claim," which gives "victims a cause of action against those who have profited from their exploitation." *A.B. v. Marriott Int'l, Inc.*, No. CV 19-5770, 2020 WL 1939678, at *7 (E.D. Pa. Apr. 22, 2020). A trafficking victim has a civil claim against anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of the TVPRA. 18 U.S.C. § 1595(a). Much like Georgia's sexual servitude statute, the TVPRA prohibits using force, fraud, or coercion to induce a person to engage in commercial sex or knowingly assisting another who commits such acts. *Id.* § 1591.

The Eleventh Circuit analyzed beneficiary claims in *Doe#1 v. Red Roof Inns, Inc.*, where it held that a person can be liable without participating in the sex trafficking act itself. 21 F.4th 714, 723 (11th Cir. 2021). The four elements are:

---

[240] Moreover, just as in *Wylie v. Denton*, the motivation of the holding in *Allum* was not that the plaintiffs participated in the predicate acts, but that those acts did not target the class of persons that included the plaintiffs.

the defendant (1) knowingly benefited, (2) from taking part in a common
undertaking or enterprise involving risk and potential profit [*i.e.*,
participation in a venture], (3) that undertaking or enterprise violated the
TVPRA as to the plaintiff, and (4) the defendant had constructive or actual
knowledge that the undertaking or enterprise violated the TVPRA as to
the plaintiff.

*Id.* at 726. None of the Defendants challenge the first element and there is a fact
question as to each of the others. Further, the Red Roof Defendants' argument that a
beneficiary claim is unavailable until a plaintiff's trafficker is convicted conflicts with
the Supreme Court authority. Finally, no authority supports Varahi's contention that
dismissal is warranted simply because others might also be liable.

### A.   Defendants knowingly participated in a venture of renting rooms to prostitutes and pimps.

Just as the Defendants' knowing rental of rooms to prostitutes and pimps triggers
RICO liability, this conduct also satisfies the TVPRA's participation element.
"Knowledge requires [a]n awareness or understanding of a fact or circumstance.'"
*Doe#1*, 21 F.4th at 725. But it is well-established that a federal claim's "knowledge
element," as under Georgia law, "can be proved by demonstrating either actual
knowledge or deliberate ignorance." *United States v. Prather*, 205 F.3d 1265, 1270
(11th Cir. 2000). "[I]f a party has his suspicions aroused but then deliberately omits to
make further enquiries, because he wishes to remain in ignorance, he is deemed to have
knowledge." *Id.* And to prove either actual knowledge or deliberate ignorance,

Plaintiffs may rely on both direct evidence and circumstantial evidence based on the "totality" of circumstances. *See United States v. Perez*, 698 F.2d 1168, 1171 (11th Cir. 1983). After all, "actual knowledge" is "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842-43 (1994).

The court in *Doe#1* explained that the participation in a venture element may be satisfied by, for example, showing that a trafficker "had prior commercial dealings with" the hotel operators through the operator's renting of rooms to a trafficker to serve their joint business objectives, and the parties "wished to reinstate [those dealings] for profit." 21 F.4th at 725–26 (citing *Ricchio v. McClean,* 853 F.3d 553, 55 (1st Cir. 2017)). Courts around the country, both before and after *Doe#1*, have agreed that a "continuous business relationship" between a hotel and a sex trafficker establishes participation in a venture element of the claim. *J.C.*, 2022 WL 4482736, at *5 (collecting cases).[241] As explained above in Argument Part II.A.1 and Background Part II.A., overwhelming evidence shows that Defendants had continuous business relationships with known pimps and prostitutes and knew they were participating in a venture of renting rooms to them at both hotels, satisfying the second element of

---

[241] *See, e.g.*, *A.G. v. Northbrook Indus., Inc.*, No. 1:20-CV-05231-JPB, 2022 WL 1644921, at *3 (N.D. Ga. May 24, 2022); *H.H. v. G6 Hosp., LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *5 (S.D. Ohio Dec. 6, 2019).

TVPRA beneficiary claim.

**B.   This venture of renting to known prostitutes and pimps violated the TVPRA as to each of the Plaintiffs.**

The record also contains evidence that the venture of renting rooms to pimps and prostitutes in which Defendants knowingly participated violated the TVPRA. A violation of the TVPRA occurs when one knowingly "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits" a sex worker if (1) the perpetrator either knows or recklessly disregards "that means of force, threats of force, fraud, coercion … or any combination of such means will be used to cause the person to engage in a commercial sex act" or (2) the perpetrator commits these acts knowing (or with reckless disregard to the fact) that the sex worker is a minor. 18 U.S.C. § 1591(a).

*First,* two Plaintiffs—TH and WK—were trafficked at the Red Roof Inn hotels when they were minors. Having a minor engage in sex for money is a *per se* trafficking violation. 18 U.S.C. § 1591(a). Even still, these young girls were subjected to the same brute force and manipulation as the slightly older victims, young women mostly in their late teens and early twenties.[242]

*Second,* most Plaintiffs testified about violence or threats of violence and force

---

[242] WK Dep. (Ex. 11) 121:12–18, 148:153:25; TH Dep. (Ex. 23) 120:6–16.

used to cause them to have sex for money. Jane Does 1–4 and RK, TH, KP, and CA were each trafficked by the same gang, PIVIP ("Pimps in Very Important Places").[243] This gang "would pass the girls around," make them wear PIVIP-branded shirts,[244] and prohibit victims from talking to or looking at other men.[245] Perhaps PIVIP's most prevalent feature was the constant threat of violence and force. Jane Doe 1 explained being beaten, including in public view at Smyrna, many times.[246] Jane Doe 2 described a PIVIP member pistol whipping her and telling her she wasn't "going anywhere" and later how another "beat the living sh*t out of her."[247] Another PIVIP trafficker used violence and threats of violence to keep Jane Doe 3, RK, TH, and CA compliant.[248] One PIVIP member likewise beat Jane Doe 4,[249] while KP's PIVIP trafficker beat her more than 10 times.[250]

Other Plaintiffs also endured their traffickers' violence. MM's trafficker burned

---

[243] *See, e.g.*, JD2 Dep. Vol. 1 (Ex. 3) 24:20-24; RK Dep. (Ex. 22) 223:16–20.

[244] JD2 Dep. Vol. 1 (Ex. 3) 38:13-22 (pass the girls around), JD2 Dep. Vol. 2 (Ex. 4) 267:15-268:3 (branded shirts); JD1 Dep. Vol. 1 (Ex. 1) 154:5–25.

[245] *See, e.g.*, RK Dep. (Ex. 22) 37:20–23; *see also* KP Dep. (Ex. 16) 36:18–22.

[246] JD1 Dep. Vol. 1 (Ex. 1) 250:4–251:25, 263:2–8.

[247] JD2 Dep. Vol. 1 (Ex. 3) 58:22–59:1, 64:6–21, 69:16–70:3.

[248] JD3 Dep. (Ex. 5) 134:6–20, 219:1–7, 286:15–287:1; TH Dep. (Ex. 23) 160:11–15; *see also* TH Dep. (Ex. 23) 161:6–16 (she saw Bagz beat RK after a buyer pulled a gun on her, forced her to perform oral sex, and then left without paying); RK Dep. (Ex. 22) 264:14–15, 280:13–17.

[249] JD4 Dep. (Ex. 6) 248:17-21 (trafficker "threw my ass in the hotel room, beat my ass and sold it"), 133:19-24, 217:12-13 (she never saw money).

[250] KP ESA Dep. (Ex. 38) 62:5–18.

64

her with a cigarette saying, "B*tch, you're not going anywhere. You belong to me now."[251] After EH's first commercial sex act, her trafficker demanded "my money" and then beat her so badly it took her days to recover.[252] DP said her trafficker "would beat [her] a lot" and "pistol whip" her, once putting her on the ground with a gun to her head, and often leaving her with "bruises everywhere."[253] AF, RP, and WK likewise testified about the beatings or rapes they suffered at the hands of their traffickers.[254]

In many cases, though, traffickers displays of violence toward others was more than sufficient to control Plaintiffs. RK explained how her first PIVIP trafficker beat another victim in a hotel bathroom so she and TH could hear it. "It was very, very loud and like it was at that point the most terrifying thing I'd ever heard[,] … enough to scare us into submission."[255] MB testified how her traffickers were part of a violent gang, and how she witnessed a gang member beat a victim bloody.[256] Likewise, the traffickers (many of whom were known to carry guns) repeatedly threatened harm to the Plaintiffs or their families if the Plaintiffs tried to escape.[257]

---

[251] MM Dep. (Ex. 25) 218:17.

[252] EH Dep. (Ex. 8) 252:2–16.

[253] DP Dep. (Ex. 7) 88:15–21.

[254] *See, e.g.*, WK Dep. (Ex. 11) 121:12–18.; RP Dep. (Ex. 10) 51:22–52:23, 111:11–113:19, 148:22–150:12.; AF Dep. (Ex. 24) 231:17–232:8.

[255] RK Dep. (Ex. 22) 196:4–12.

[256] MB Dep. (Ex. 9) 122:8–24,196:20–197:6.

[257] *See, e.g.*, JD4 Dep. (Ex. 6) 108:14–20; JD3 Dep. (Ex. 5) 219:1–7; AF Dep. (Ex. 24) 190:22–191:3; MM Dep. (Ex. 25) 232:8–19.

*Third,* though the threat of violence was constant, the statute does not require physical harm. Trafficking may occur through coercion, including any threats of "serious harm" or any "scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm." *Id.* 1591(e)(2). And "serious harm" may be "nonphysical," such as "psychological, financial, or reputational harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or continue performing commercial sexual activity in order to avoid incurring that harm." *Id.* 1591(e)(5); *see, e.g.*, *Carson*, 870 F.3d at 594 (recognizing that traffickers might exploit victims' mental health issues, feign love and affection, control the victims' access to money, phones, or other resources, "manipulat[e] them with false promises[,] and control[] their access to the drugs for which they were physically and mentally dependent").

Trafficking expert Anique Whitmore confirmed how traffickers "prey on vulnerable individuals" relying on "various physical, emotional, and psychological techniques to cause a victim to engage in commercial sex."[258] For example, traffickers often paired violence with manipulation, including false displays of love and

---

[258] Whitmore Report (Ex. 139) at 5–9.

affection,[259] and exploited Plaintiffs' vulnerabilities, like homelessness, estrangement from family, lack of access to money or resources, drug addition, prior sexual abuse, and mental health issues.[260]

Many victims suffered serious drug addictions or mental health issues that their traffickers exacerbated, exploited, and in some cases created. As Jane Doe 2 testified about her and Jane Doe 1, "traffickers would take our vulnerability and just control us with our addiction."[261] MM, EH, DP, and WK also had drug addictions that the traffickers exploited.[262] DP was diagnosed with schizophrenia and bipolar disorder and

---

[259] *See, e.g.*, EH Dep. (Ex. 8) 234:22–242:14, 245:7–247:23, 249:8–253:17, 254:6–25; JD3 Dep. (Ex. 5) 134:6–20, 151:9–21, 153:1–8, 219:1–7, 286:15–287:1; TH Dep. (Ex. 23) 161:6–16; RK Dep. (Ex. 22) 72:25–73:21, 76:9–17; 83:8–17, 160:11–15, 238:3–13, 240:8–20, 264:14–15, 280:13–17; CA Dep. Vol. 1 (Ex. 20) 81:23–82:9 (cult, manipulation), 110:11–111:18, 115:3–11, 88:11–15; CA Resp. to Rog. (Ex. 70) at 23–24; *see also* Whitmore Report (Ex. 139) at 6, 28-30.
CA Resp. to Rog. (Ex. 70) at 23–24.
[260] *See, e.g.*, JD1 Dep. Vol. 1 (Ex. 1) 114:9–11 (drug addiction); JD2 Dep. Vol. 1 (Ex. 3) 63:2–16 (drug addiction); JD3 Dep. (Ex. 5) 153:13–22 (homeless and estranged from her family); MM Dep. (Ex. 25) 205:9–206:23, 211:5–7 (drug addiction and depression); DP Dep. (Ex. 7) 50:4–52:25, 146:22–149:25 (prior sexual abuse and mental health issues); MB Dep. (Ex. 9) 38:4–39:20 (childhood abuse), 64:23–65:8 (no job or place to live); RP Dep. (Ex. 10) 42:2–43:16 (bipolar); RK Dep. (Ex. 22) 199:4–9 (no money); WK Dep. (Ex. 11) 63:22–65:4 (sexual abuse and broken home), 100:7–11, 101:5–102:4 (drug addiction); EH Dep. (Ex. 8) 179:4–9 (childhood abuse); AF Dep. (Ex. 24) 270:4–9 (childhood abuse); *see also* Whitmore Report (Ex. 139) at 6, 19, 22, 26–27, 29, 31, 34, 39, 42, 46–47, 51–52, 54–55, 59, 62–63, 64 , 66.
[261] JD2 Dep. Vol. 1 (Ex. 3) 63:4–16.
[262] *See* MM Dep. (Ex. 25) 206:4–23, 209:5–210:2, 211:3–16, 217:1–219:2; WK Dep. (Ex. 11) 100:7–11, 101:5–102:4, 117:1–2,146:5–7, 165:5–9; EH Dep. (Ex. 8) 201:2–

had a long history of sexual abuse that her traffickers exploited. And RP's trafficker exploited her past trauma of violence and rape and her mental health issues to coerce her to have sex for money.[263]

Based on these facts, described in detail in the Plaintiffs' Statement of Disputed Facts, a jury could conclude the traffickers used some combination of force, fraud, or coercion to "cause [them] to engage in a commercial sex act" at the Red Roof hotels. 18 U.S.C. § 1591(a). Thus, the Defendants' venture of knowingly renting rooms to pimps and prostitutes violated the TVPRA as to each Plaintiff.

### C.   The Defendants knew or should have known about the TVPRA violations as to the Plaintiffs.

To establish the last element of their TVPRA claim, Plaintiffs do not need to show that Defendants had actual knowledge of these trafficking violations. *Doe#1*, 21 F.4th 725. Instead, Plaintiffs must show only constructive knowledge, "that knowledge which 'one using reasonable care or diligence *should* have.'" *Id.* (quoting Black's Law Dictionary). The constructive knowledge standard is a fact-intensive one requiring the jury to consider the totality of circumstances. *See, e.g., Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306 (11th Cir. 2007) (applying a fact-intensive inquiry to the FLSA's

---

8, 256:7–11; 256:7–11 (started cocaine during trafficking); EH Resp. to Rog. (Ex. 74) at 21 (testifying that her trafficker forced her to use drugs and used drug addiction to control her), 26 (cocaine). DP Dep. (Ex. 7) 80:2–6 (trafficker fed her drugs), 81:23–25.
[263] *See* RP Dep. (Ex. 10) 42:2–43:16, 81:14–82:3.

constructive knowledge standard); *Matt v. Days Inns of Am., Inc.*, 212 Ga. App. 792, 794–95 (1994) (considering the totality of circumstances to hold that a hotel knew or should have known of a risk of harm).

To assess constructive knowledge, courts consider the conduct's pervasiveness. *E.g., Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982) (the "pervasiveness of the harassment" gives rise to the inference of knowledge or constructive knowledge in a Title VII hostile work environment claim). In the context of a TVPRA beneficiary claim, courts also consider the defendant's "failure to implement policies sufficient to combat a known problem in one's operations." *M.A. v. Wyndham Hotel & Resorts, Inc.,* 425 F.Supp.3d 959, 968 (S.D. Ohio 2019). Indeed, if the signs were there and the Defendant simply turned a blind eye—not exercising reasonable diligence to uncover TVPRA violations—the constructive knowledge element is satisfied. *Id.*

In *M.A.*, the conduct's pervasiveness, including common trafficking indicators, and the defendants' lack of effort to combat the known problem were sufficient to allege constructive knowledge. *Id.* The *M.A.* plaintiff alleged that "hotel staff should have recognized … signs of her trafficking," including that: (1) "her trafficker asked for rooms" in a particular part of the hotel to make trafficking easier; (2) her trafficker "escorted" her by the front desk; (3) her rooms contained lubricant bottles, boxes of condoms, and "an extraordinary number of used condoms" in the trash; (4) the

"trafficker operated the sex trafficking venture out of the same hotel room for multiple days or weeks in succession"; (5) the plaintiff was forced to see ten buyers per day, who came in and out of her room; (6) the plaintiff made excessive requests for linens; (7) the rooms were "frequently paid for with cash"; and (8) the plaintiff exhibited obvious signs of human trafficking like physical deterioration and unwillingness to make eye contact. *Id.* at 967.

The plaintiff in *M.A.* also alleged that the defendants were aware of "the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff" to prevent it. *Id.* at 968. The court applied the TVPRA's negligence standard and held, based on the totality of circumstances, that the plaintiff sufficiently alleged constructive knowledge. *Id.*; *see also J.G. v. Northbrook Indus., Inc.*, 2022 WL 4482735, at *6–7 (N.D. Ga. Aug. 2, 2022) (similar allegations supported a claim of constructive notice of TVPRA violations); *G.W. v. Northbrook Indus., Inc.*, 2022 WL 1644923, at *1–4 (N.D. Ga. May 24, 2022) (the victim's "appearance, her behavior and the number of men coming and going from her hotel room" satisfied the should have known standard.)

Perhaps the most telling sign of trafficking is a pimp's presence. Trafficking expert Anique Whitmore testified that 98% of the time, a pimp is in fact engaged in

70

trafficking.[264] And as the Eleventh Circuit has also observed, when a pimp is involved in commercial sex, "there is always a serious risk that [the pimp] will use force" at some point, "if she disobeys his rules, fails to obtain a client, or for any number of reasons." *United States v. Craig*, 706 F. App'x 545, 550 (11th Cir. 2017).

Like the allegations in *M.A.*, this record shows both actual and constructive knowledge of trafficking. As explained in Part I of the Background, the Defendants had actual knowledge of rampant prostitution at these hotels, generally. And as explained in Background Part III.C, the hotel industry and Red Roof in particular, was aware of the problem of trafficking, including trafficking at Red Roof properties, and should have known the common signs of such by at least 2012. Defendants' own witnesses further admitted that these signs included the same factors the *M.A.* court found triggered constructive knowledge. And as explained next, the same signs were evident in Plaintiffs' trafficking. Despite this knowledge, as explained in Background Part II.B, the Defendants had no policy and little training addressing trafficking. Given this evidence, viewed in the light most favorable to Plaintiffs, a reasonable hotel exercising diligence should have known of the TVPRA violations as to the Plaintiffs.

1. ***The record contains evidence of knowledge of trafficking at Buckhead as to the WK Plaintiffs.***

---

[264] Whitmore Dep. (Ex. 172) 170:18–21, 171:19–21.

At the Buckhead property, the Red Roof Defendants had actual, or at least, constructive knowledge of the trafficking violations as to the PIVIP Plaintiffs (RK, TH, KP, and CA), RP, and WK.[265] *First*, the sheer volume of commercial sex was an indication of force, fraud, or coercion. *See G.W.*, 2022 WL 1644923, at *1–4. Each of these Plaintiffs testified that she was forced to see multiple men (usually at least 10) each day, and in many cases, she was in a room with other victims doing the same or the trafficker would rent multiple rooms for multiple victims.[266] Most Plaintiffs testified that they (or in WK's case, her trafficker) requested an extraordinary number of extra sheets and towel to clean up from the constant flow of buyers.[267] And the trashcans in the room were overflowing with condoms.[268]

*Second*, the appearance of the Plaintiffs was a sign of trafficking. *Id.* Some

---

[265] RK, TH, KP, and CA were trafficked at the Buckhead location, and WK and RP at both locations. *See* Plaintiffs' Trafficking – Location and Years (Ex. 49).

[266] TH Dep. (Ex. 23) 149:6–150:17, 150:25–151:8 (TH and RK had to see 10 buyers a day each); RK Dep. (Ex. 22) 206:11–21, 250:16–251:4, 303:4–9; RK Resp. to Rog. (Ex. 76) at 30–31; KP Dep. (Ex. 16) 66:2–67; KP Resp. to Rog. (Ex. 77) at 19 (constant stream of buyers for stays of an hour each); CA Resp. to Rog. (Ex. 70) at 24 (quota); *id.* at 27–28 (Bagz rented 2-3 rooms at a time); RP Dep. (Ex. 10) 147:20–148:2 (10 men/day); WK's Dep. (Ex. 11) 120:7–121:9 (up to 15 buyers a day).

[267] RK Dep. (Ex. 22) 267:5–12; TH Dep. (Ex. 23) 275:8–14; KP Resp. to Rog. (Ex. 77) at 19; RP Dep. (Ex. 10) 313:3–18; WK Dep. (Ex. 11) 195:21–196:25.

[268] TH Dep. (Ex. 23) 274:4–17 (up to 20 used condoms in PIVIP rooms); RK Resp. to Rog. (Ex. 76) at 31; CA Resp. to Rog. (Ex. 70) at 29 (testifying about condoms at other hotels as well); KP Resp. to Rog. (Ex. 77) at 19; WK Resp. to Rog. (Ex. 69) at 21; RP Resp. to Rog. (Ex. 80) at 23.

dressed scantily in provocative clothing.[269] KP testified how she eventually looked "incredibly pale and sleep deprived."[270] And many Plaintiffs were beaten to the point of bruising or other injuries that would have been apparent.[271] Moreover, in most cases, the victims (or in some cases their trafficker) went to the front desk to pay for the rooms in cash, usually on a per-night basis.[272]

*Third*, these Plaintiffs also showed signs of submissiveness. PIVIP required its victims (including KP, CA, TH, and RK) to keep their heads down and avoid eye contact.[273] This conduct was particularly indicative of trafficking in light of the constant presence PIVIP traffickers, who "flaunt[ed]" their conduct, dressing in loud clothes and lots of "bling."[274]

*Fourth*, as described above in Background Part I.A, workers at the Buckhead

---

[269] KP Resp. to Rog. (Ex. 77) at 19; TH Dep. (Ex.23) 274:4–17; RK Resp. to Rog. (Ex. 76) at 30; RK Dep. (Ex. 22) 271:16–24; CA Resp. to Rog. (Ex. 70) at 28.

[270] KP Dep. (Ex. 16) 185:4–12.

[271] *See, e.g.*, RP Dep. (Ex. 10) 75:7–13; KP ESA Dep. (Ex. 38) 62:5–18; *see also* KP Dep. (Ex. 16) 104:20–105:14; CA Dep. Vol. 2 (Ex. 21) 261:24–262:3 (trafficker broke her nose); CA Resp. to Rog. (Ex. 70) at 38 ; CA ESA Dep. (Ex. 39) 177:21–23, 180:12–181:6; RK Dep. (Ex. 22) 39:9–14, 264:14–15, 286:11–19.

[272] RK Dep. (Ex. 22) 267:5–12, 271:23–24; TH Dep. (Ex. 23) 274:20–21; RP Resp. to Rog. (Ex. 80) at 22.

[273] RK Dep. (Ex. 22) 37:19–23 (testifying that PIVIP had a rule that you had to keep your head down), 219:20–23, 269:23–271:4; KP Dep. (Ex. 16) 36:18–22; RP Resp. to Rog. (Ex. 80) at 22.

[274] TH's Dep. (Ex. 23) 286:12–13; RK Dep. (Ex. 22) 269:23–272:1; CA Resp. to Rog. (Ex. 70) at 25; RP Resp. to Rog. (Ex. 80) at 23.

property, who were all agents of at least one of the Red Roof entities, admitted to seeing many of these signs. And the workers at this hotel had continuous relationships with both the PIVIP traffickers, who would gather openly in the parking lot to hang out with sex workers.[275] RP's trafficker, who was in a wheelchair, was also not discrete, and Buckhead worker Michael Thomas testified to seeing a pimp in a wheelchair.[276] RP also testified that her trafficker relied on the workers to serve as lookouts.[277] On this record, a reasonable jury could find that an innkeeper in Red Roof Inn's position exercising reasonable diligence or care should have known of the trafficking violations as to the Plaintiffs.

## 2. *The record contains evidence of knowledge of trafficking at Smyrna as to the WK Plaintiffs.*

Varahi and the Red Roof Inn Defendants also had constructive knowledge of trafficking violations as to Plaintiffs RP and WK as well as MM, EH, MB, DP, and AF at the Smyrna property. Many of the same indicators of trafficking at the Buckhead property were present at Smyrna. Varahi employees would have observed, for example,

---

[275] RK Dep. (Ex. 22) 269:1–14; TH Dep. (Ex. 23) 278:18–279:3.
[276] Thomas Dep. (Ex. 14) 34:3–9, 36:8–13.
[277] RP Dep. (Ex. 10) 215:1–7, 297:24–298:23.

DP and AF dressed in scantily-clad outfits,[278] excessive requests for towels or sheets,[279] voluminous condoms in the trash cans,[280] a revolving door of buyers throughout the day and night,[281] paying for rooms daily in cash,[282] and indiscrete pimps keeping their eyes on their victims.[283] RP also confirmed that, like the PIVIP victims, she also kept her head down and acted submissive.[284]   And most of her stays at this hotel lasted several days, but once, she was trafficked at Smyrna "for a whole month," giving the hotel ample opportunity to observe her trafficking.[285]

The violence at this hotel was in the open. Castille not only admitted that prostitution was constant at Smyrna,[286] he also saw pimps beat their victims "like they

---

[278] DP Dep. (Ex. 7) 263:3–21; AF Dep. (Ex. 24) 247:17–21.

[279] RP Dep. (Ex. 22) 313:3–18; WK Dep. (Ex. 11) 195:21–196:25; MM Resp. to Rog. (Ex. 78) at 27; EH Dep. (Ex. 8) 125; MB's Dep. (Ex. 9) 195:13–23; AF's Dep. (Ex. 24) 39:6–40:6, 256:11–14.

[280] WK Resp. to Rog. (Ex. 69) at 21; RP Resp. to Rog. (Ex. 80) at 23; MM Resp. to Rog. (Ex. 78) at 27; EH Resp. to Rog (Ex. 74) at 23; MB Dep. (Ex. 9) 199:13–201:25, 200:2–9.

[281] RP Dep. (Ex. 10) 147:20–148:2 (10 men/day); WK's Dep. (Ex. 11) 120:7–121:9 (up to 15 buyers a day); MM Resp. to RRI Rog. (Ex. 78) at 27; EH Resp. to Rog (Ex. 74) at 22; EH Dep. (Ex. 8) 107:25–108:16; MB Dep. (Ex. 9) 230:20–232:1, 292:6–13, 293:17–19; DP's Dep. (Ex. 7) 48:6–8, 296:22–297; DP Resp. to Rog. (Ex. 71) at 23; AF Dep. (Ex. 24) 214:11–22.

[282] MB's Dep. (Ex. 9) 189:3–23; AF Dep. (Ex. 24) 246:11–23.

[283] RP Resp. to Rog. (Ex. 80) at 23; MB's Dep. (Ex. 9) 203:14–20; DP's Dep. (Ex. 7) 48:6–8, 296:22–297; DP Resp. to Rog. (Ex. 71) at 23; EH Dep. (Ex. 8) 69:22–23.

[284] RP Resp. to Rog. (Ex. 80) at 22.

[285] RP Dep. (Ex. 10) 129:9-12.

[286] Castille Dep. (Ex. 19) 42:22–25.

were men" and how victims worked for their traffickers to get their "fix."[287] WK described a particularly traumatic night at this hotel where her trafficker choked her in the hallway—in view of a hotel worker who made eye contact with her but did nothing—and then tried to drown in her in a bathtub.[288] DP testified how there was "constant fighting"[289] in her room and how she often had "bruises everywhere."[290] And EH testified that, at this hotel, she was trafficked alongside a minor who always had bruises on her so "[y]ou could tell she was always being beaten."[291]

Moreover, just as at Buckhead, here Plaintiffs interacted with hotel workers. MB, for example, testified how she made sure the condoms were on the top of the trash can so housekeeping would see it, and how she once gave a housekeeper sheets and towels, bloodied after her trafficker beat another victim, telling her desperately that there was "a lot going on," but this just fell on deaf ears.[292]

Even worse, workers like Castille served as lookouts for the traffickers. MM testified how her trafficker sold the workers marijuana and how the workers, including Castille, would alert them if police were nearby.[293] Likewise, EH testified how a

---

[287] Castille Dep. (Ex. 19) 26:20–27:9.
[288] WK Dep. (Ex. 11) 148:153:25, 151:15–21, 152:18–153:1.
[289] DP Dep. (Ex. 7) 296:22–297:2.
[290] DP Dep. (Ex. 7) 88:15–21.
[291] EH Dep. (Ex. 8) 113:17–12.
[292] MB Dep. (Ex. 9) 196:20–197:6, 199:17–200:9, 234:22–25.
[293] MM Dep. (Ex. 25) 221:10–21, 52:14–253:2; 270:2–10.

security guard at this hotel served as a lookout and how she was sold for sex to him and two other hotel workers.[294] And DP testified how her trafficker had a continuing relationship with hotel workers, even conferring with a security guard to pick which rooms he should stay in.[295] This man once told her after a loud fight in her room that he "knew what [they] were doing."[296] Again, not each indicator was present for every Plaintiff, but given the volume of known prostitution and violence, any hotel exercising diligence should have known of the trafficking violations as to each Plaintiff.

To be sure, WK, who was a minor, had less interactions with the hotel workers than the others at both hotels. For example, her trafficker did not have her go the front desk to check in, which is unsurprising as she was only 16 years old.[297] But as she testified, frequently while she was trafficked at this hotel, WK walked around the property, often with her traffickers' two other minor victims (about 13 or 14 years old), all dressed in revealing clothes like fishnet stockings and one-piece body suits.[298] Her trafficker also frequented these hotels, maintaining a friendly relationship with the workers, to whom he would sell drugs.[299] Plus, he trafficked the two other minors at

---

[294] EH Dep. (Ex. 8) 130:14–131:8, 141:16–142:4.

[295] DP Dep. (Ex. 7) 43:22–44:11.

[296] DP Dep. (Ex. 7) 40:15–24.

[297] WK Dep. (Ex. 11) 133:9-16 (never checked in), 177:24–178:1 (confirming she was 16 in Dec. 2014).

[298] WK Decl. (Ex. 68) ¶ 6.

[299] WK Resp. to Rog. (Ex. 69) at 21.

the same time, all out of the same room with WK.[300] Anyone paying attention would have seen three minor victims going in and out of their room, with a pimp standing watch, and one could not miss the volume of buyers; indeed, WK alone saw up to 15 men each day.[301]

Moreover, the workers at the hotels who knew this trafficker also assisted by putting him in the back of the hotel, at best choosing to stay willfully blind.[302] And even worse, as WK testified, one Smyrna worker made eye-contract with her while her trafficker choked her outside her room and then brought her back in where he nearly drowned her in the bathtub.[303] Varahi suggests that because she didn't engage in commercial sex after this worker saw the choking incident, she wasn't a TVPRA victim, but that's contrary to the Eleventh Circuit's decision in *United States v. Mozie*, which held that § 1591 does not require that the victim actually engage in commercial sex. 752 F.3d 1271, 1286 (11th Cir. 2014). It is enough that the perpetrator, for example, harbored her for that purpose, *see id.*, as WK's trafficker did here. *See also Ricchio*, 853 F.3d at 557–58 (harboring or obtaining victim constitutes sex trafficking, even where no commercial sex act ever takes place). Under these circumstances, a

---

[300] WK Resp. to Rog. (Ex. 69) at 21; WK Dep. (Ex. 11) 138:7–10.
[301] *Id.* at 134:18–19, 120:10–121:9.
[302] *Id.* at 139:9–10.
[303] *Id.* at 148:153:25, 151:15–21.

reasonable jury could infer that the Red Roof Defendants had constructive knowledge of the trafficking violations as to WK.

Finally, it was not just Varahi which had at least constructive knowledge of the trafficking violations as to the Plaintiffs. Before December 2012, the Red Roof Defendants employed the workers on the ground and thus had the same knowledge. And after December 2012, as explained above in Background Part I.C. and III.A-B, Red Roof corporate employees also received notice of voluminous prostitution and pimping, including direct notice to the Red Roof President that Anthony Shivers was "trafficking women" at this hotel. This notice—coupled with the indicators described above, which were obvious to any person at the hotel—should have triggered diligence. *See Doe#1*, 21 F.4th 725; *M.A.*, 425 F.Supp.3d at 968. Rather than acting diligently, as explained above in Background Part II.B, the Red Roof Defendants ignored this evidence, choosing to continue to profit from the known prostitution venture. Turning this blind eye in the face of this evidence creates a fact question on constructive knowledge of trafficking of the Plaintiffs.

### D.    A TVPRA civil claim does not require a criminal conviction.

Courts have repeatedly held that "[t]here is no requirement that the sex trafficker have been convicted criminally to support a civil claim against defendant[] for knowingly financially benefitting from the sex trafficking." *Lundstrom v. Choice*

*Hotels Int'l, Inc.*, 2021 WL 5579117, at *4 (D. Colo. Nov. 30, 2021); *accord S.Y. v. Choice Hotels Int'l, Inc.*, 2021 WL 1610101, at *4 (M.D. Fla. Apr. 26, 2021). Just like the defendants in those cases, Defendants "provide[] no legal support for this argument." *Lundstrom*, 2021 WL 5579117, at *4.

Defendants point only to the general principle that a statute's plain language governs, but that principle undermines their position. Nowhere does the TVPRA say that a plaintiff must prove a TVPRA "conviction." Instead, the statute requires proof only that there was a "violation." 18 U.S.C. § 1595(a). As the Supreme Court held in *Sedima*—where the Court rejected the same argument, but as to RICO—the plain meaning of the term "'violation' does not imply a criminal conviction"; rather, it "refers only to a failure to adhere to legal requirements." 473 U.S. at 489-91 (also rejecting "reasonable doubt" standard because civil sanctions require only a preponderance of the evidence standard).[304] What was true of RICO in *Sedima* is true of TVPRA here, and the Court should thus follow *Sedima*.

### E.     Rule 19 does not support dismissal.

---

[304] The TVPRA expressly contemplates that "civil action filed under [1595](a)" may be filed without a criminal conviction. 18 U.S.C. § 1595(b)(1). Under § 1595(b)(1), if the government brings a "criminal action arising out of the same occurrence in which the claimant is a victim," the civil action must be stayed. If a conviction were a *prerequisite* to a civil claim, a civil claim would simply be dismissed.

Varahi argues that this Court should grant summary judgment under Rule 19 because there are other actors who might be liable in addition to Varahi. Technically, the Rules don't allow Rule 19 arguments at summary judgment. *See* Fed. R. Civ. P. 12(h)(2) (permitting Rule 19 arguments in "pleadings," defined in Rule 7(a), a motion for judgment on the pleadings under Rule 12(c), or at trial); *see also In re Managed Care Litig.*, 2004 WL 7334074, at *2 (S.D. Fla. June 15, 2004), *R&R adopted*, 2004 WL 7334072 (S.D. Fla. Aug. 17, 2004). But there's no reason to wait to reject Varahi's argument, because, under governing law, it is clear that Plaintiffs did not fail to join indispensable parties under Rule 19.

A person is one who should be joined if "the court cannot accord complete relief among existing parties" in the person's absence. Fed. R. Civ. P. 19(a)(1)(A). "The 'complete' relief concept of Rule 19(a)(1) refers to relief as between the persons already parties, not as between a party and the absent [party] whose joinder is sought." *Fair Fight Action, Inc. v. Raffensperger*, 413 F.Supp.3d 1251, 1282 (N.D. Ga. 2019).

Moreover, "[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990). Indeed, the Eleventh Circuit recently reaffirmed this precedent in *Lynn v. O'Quinn*, holding that "where joint tortfeasors may be jointly and severally liable, neither tortfeasor is an indispensable party." 607 F.App'x 931, 934 (11th Cir.

81

2015) (collecting cases); *see also* Fed. R. Civ. P. 19 advisory committee's note ("[A] tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability.").

Varahi ignores this rule, arguing that two classes of joint tortfeasors are nonetheless indispensable. *First*, Varahi says the joint tortfeasor rule does not apply to the traffickers because Varahi's liability "is so connected" to them that it "cannot be held liable unless the sex trafficker is also found to be liable."[305] But even if Varahi's liability depends on a finding that a trafficker violated the TVPRA, that doesn't make the trafficker an indispensable party. In fact, the only case Varahi cites *rejected* the notion that tortious conduct "necessarily requir[ing] more than one participant"—like TVPRA violations—makes all participants indispensable parties. *See Malibu Media, LLC v. Fitzpatrick*, 2013 WL 5674711, at *5 (S.D. Fla. Oct. 17, 2013) (holding that non-parties involved in a BitTorrent scheme to pirate video content were not indispensable, even though scheme necessarily included them). And many other courts have likewise held that a non-party is not indispensable even if the defendant's liability depends on the non-party's liability. *E.g.*, *Ferreira v. City of Binghamton*, 975 F.3d 255, 278 (2d Cir. 2020) (joining employee unnecessary "to obtain *respondeat superior*

---

[305] Doc. 145-1 at 13–14. This is a variation on Defendants' assertion that there can be no civil liability under the TVPRA until the trafficker is convicted of a TVPRA crime. Plaintiffs explain why that's wrong above in Argument, Part II.D.

liability of the employer"); *Nottingham v. Gen. Am. Commc'ns Corp.*, 811 F.2d 873, 880 (5th Cir. 1987) ("Nor does [Rule 19] require joinder of principal and agent.").

*Second*, Varahi says that the joint tortfeasor rule should not apply to the other hotels where Plaintiffs were trafficked, because Varahi might be found jointly and severally liable without the right to sue these joint tortfeasors for contribution. Varahi cites nothing to support this argument, likely because the right to contribution has no bearing on whether a party is indispensable under Rule 19. In *Liberles v. Cook County*, for example, the Seventh Circuit recognized that defendants had no right to contribution from the federal government even if the government "did bear a significant responsibility" for plaintiff's injuries. 709 F.2d 1122, 1135 (7th Cir. 1983). But the court rejected the notion that the defendants' lack of a contribution right made the federal government an indispensable party. *Id. Cf. N.H. Ins. Co. v. Cincinnati Ins. Co.*, No. CIV.A. 14-0099-CG-N, 2014 WL 3428911, at *2 n.5 (S.D. Ala. July 15, 2014) ("The fact that the existing Defendants may have some right of reimbursement, contribution, or indemnity against a non-party [does not] make the non-party indispensable."). Here, too, whether Varahi lacks a contribution right is irrelevant to whether other hotels are indispensable parties.

Then, in an about face, Varahi claims that the TVPRA might *not* allow joint and several liability, arguing *that* as a basis for Rule 19 dismissal. This argument is both

83

wrong and pointless. It is wrong because, although the TVPRA is silent on joint liability for a beneficiary claim, the statute clearly contemplates joint and several liability for restitution. *See* 18 U.S.C. § 1593(b) (providing that a restitution order "shall be issued and enforced in accordance with section 3664"); 18 U.S.C. § 3664 (allowing the court to "make each defendant liable for payment of the full amount of restitution"). As one federal court held, this provides a statutory basis for imposing joint and several liability in the civil context. *Leiva v. Clute*, 4:19-cv-87-TLS-JPK, 2020 WL 8514822, at *21 (N.D. Ind. Dec. 16, 2020).

Varahi's argument is also wrong because there are non-statutory bases for joint and several liability, including that (1) the tortfeasors "engage[d] in a common enterprise," acting "in concert or unity of action," *Thompson v. Johnson*, 180 F.2d 431, 434 (5th Cir. 1950); (2) Varahi substantially assisted others' TVPRA violations, *see FTC v. WV Universal Mgmt, LLC*, 877 F.3d 1234, 1242 (11th Cir. 2017); and (3) the Plaintiffs' injuries are indivisible. *See, e.g.*, *Whyte v. Alston Mgmt., Inc.,* No. 10-cv-81041, 2012 WL 11789773, at *1 (S.D. Fla. Apr. 11, 2012) ("[W]here several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury."); *Edmonds v. Compagnie Gen. Transatlantique*, 443 U.S. 256, 260 (1979) (recognizing joint and several liability under "common law" where "the tortfeasor's negligence was a

84

substantial factor in causing the [harm], even if the concurrent negligence of others contributed"). Any of these theories could result in Varahi's  jointly and several liability.

Varahi's argument is also pointless. Even if joint liability were unavailable, the result is not dismissal but apportionment. And contrary to Varahi's contention, if the law required a jury to apportion liability, the jury would have ample evidence to do so, as Varahi's own cases confirm. In *CRS Sirrine, Inc. v. Dravo Corp.*, for example, the defendant argued that the plaintiff could not recover anything without "specifically identify[ing] which aspects of the overall loss were specifically and solely the result of [defendant's] conduct." 219 Ga. App. 301, 303 (1995). But the court held that this would establish an "almost impossible" standard, "resulting in nonliability for the defendant even when it is clear that the defendant caused a substantial portion of" plaintiff's damages. *Id.* "While mere speculation cannot support a damage award, all that is required is evidence from which damages can be estimated with reasonable certainty, and difficulty in fixing the exact amount should not preclude recovery." *Id.* If it had to, a jury could apportion fault based on, for example, relative culpability, time spent at hotels, or the degree of injury or trauma at each hotel. Indeed, in each Georgia case Varahi cites, the court found that there *was* a reasonable basis for the jury's

apportionment. *E.g.*, *id.* at 303; *Tucker Nursing Ctr. v. Mosby*, 303 Ga. App. 80, 82–83 (2010); *Scriver v. Lister*, 235 Ga. App. 487, 489 (1998).

In sum, none of the courts around the country considering TVPRA claims has found non-party venture participants indispensable parties. Even in *M.A.*, which Varahi also cites, the court rejected this argument because joint tortfeasors' absence did not prevent "determining liability as to the other parties." 425 F.Supp.3d at 974. Varahi "bears the burden of establishing that a party is necessary or indispensable under Rule 19." *Hardy v. IGT, Inc.*, 2011 WL 3583745, at *2 (M.D. Ala. Aug. 15, 2011). It failed to satisfy that burden.

## III.   The evidence supports Plaintiffs' negligence claims.

Defendants challenge Plaintiffs' negligence claims by arguing about what duties Defendants owed. They do not challenge the breach, damages, nor causation elements, except to argue that because third party criminal acts were not reasonably foreseeable, they break the causal connection. But because evidence supports the conclusion these acts *were* reasonably foreseeable, Defendants' arguments fail.

### A.   Plaintiffs were invitees.

#### 1.   *Whether rooms were rented by Plaintiffs or others, Georgia law makes Plaintiffs invitees on the hotel properties.*

There is "no question that one who rents a hotel room is an invitee on the hotel's premises." J.G., 2022 WL 4482735, at *7. Georgia law has also long recognized that a

86

tenant's guest "is an invitee upon the premises of the landlord where he is invited by the tenant and visits him in such premises." *Frazier v. Godley Park Homeowners Ass'n, Inc.*, 342 Ga. App. 608, 609 (2017). Because Plaintiffs rented rooms themselves or their traffickers rented rooms for their use,[306] they were either tenants or a tenant's guest. Either way, they were invitees.

Further, "[a]n invitation may arise from known customary use" or "be inferred from conduct." *Id*. For example, in *Frazier*, the Court of Appeals found a jury question on whether a child who drowned in the pool in his aunt's subdivision was an invitee, even though the homeowners' association required residents to register guests and accompany them to the pool. *Id.* The aunt's testimony that she frequently allowed her family to use her pool key without her there and that the pool was often open so that anyone could get in created a jury question. *Id.* Likewise, "known customary use" leads to an inference that Plaintiffs were invitees. Defendants' employees knew it was customary—indeed, a daily occurrence—for multiple people to come and go from rooms, including those who were not registered guests.[307]

### 2.    *Plaintiffs' engagement in commercial sex does not change their status*

---

[306] Ex. 49; JD3 Dep. (Ex. 5) 303:17–18; TH Dep. (Ex. 23) 138:2–7, 276:7–9; RK Dep. (Ex. 22) 265:12–16; JD2 Dep. Vol. 1 (Ex. 3) 203:204:2; CA Resp. to Rog. (Ex. 70) at 28.

[307] Castille Dep. (Ex. 19) 37:10–11, 37:19–23; Cole Aff. (Ex. 65) ¶ 4; Conner Aff. (Ex. 67) ¶ 11; Conner Dep. (Ex. 40) 29:6–18; 106:12–15.

*as invitees.*

The fact that Plaintiffs were engaging in (involuntary) commercial sex in the hotel rooms does not change Plaintiffs' status as invitees. "[T]he question is not whether Plaintiff[s] engaged in unlawful activity while on [Red Roof] property." *J.G.*, 2022 WL 4482735, at *8. Indeed, O.C.G.A. § 51-3-1 "does not preclude those who commit—or are victims of—unlawful acts from being invitees; rather, the plain language of the statute applies when the *'owner or occupier of the land*, by express or implied invitation, *induces or leads* others to come upon his premises *for any lawful purpose.*" *Id.* at *8 (citing *Stephens v. Clairmont Ctr., Inc.*, 230 Ga. App. 793 (1998)). In *Stephens*, the Court of Appeals found three men who entered a shop posing as customers to rob it and who eventually shot a security guard there were nonetheless invitees. 230 Ga. App. at 793. Plaintiffs' commercial sex (even if voluntary, as Defendants suggest and the record disputes) does not negate their status as invitees because they were induced to come upon the premises for the lawful purpose of renting hotel rooms.

"[E]vidence that [Plaintiffs] had a dual purpose [in] being on the property" or other evidence that Plaintiffs were trespassers does "not nullify" the evidence Plaintiffs were invitees. *McGarity v. Hart Elec. Membership Corp.*, 307 Ga. App. 739, 744 (2011). Such evidence still precludes summary judgment, as competing evidence

Plaintiffs were trespassers only creates a jury question. *Id.*

Finally, even were Plaintiffs trespassers as a matter of law, because evidence supports the conclusion that Defendants acted with gross negligence, Plaintiffs may nonetheless recover. That's because if a defendant's negligence is so gross as to be willful or reckless, even trespassers may recover. *Handberry v. Stuckey Timberland, Inc.,* 345 Ga. App. 191, 195 (2018). And the evidence showing Defendants' active assistance to traffickers on the properties, described in Background, Part II.A., satisfies this recklessness standard.[308]

### B. Defendants have a duty to take reasonable steps to prevent reasonably foreseeable criminal acts.

Georgia law "imposes a nondelegable duty upon a landowner to keep [its] premises in a reasonably safe condition." *TGM Ashley Lakes, Inc. v. Jennings*, 264 Ga. App. 456, 462 (2003) (*en banc*). This includes the duty to protect against reasonably foreseeable criminal acts, which do not sever any causal relationship. *Id.* Reasonable foreseeability does not require "actual knowledge of criminal conduct." *Walker v. Aderhold Props., Inc.*, 303 Ga. App. 710, 713 (2010) (*en banc*). Instead, a defendant remains "liable for third-party criminal attacks if [defendant] has *reasonable grounds* to apprehend that such a criminal act would be committed but fails to take steps to

---

[308] *See* Background, Part II.A.

guard against injury." *TGM*, 264 Ga. App. at 462. Moreover, "the question of reasonable foreseeability of a criminal attack is generally for a jury's determination." *Six Flags Over Ga. II, L.P. v. Martin*, 335 Ga. App. 350, 361 (2015).

### 1.    The obviousness of the danger and Red Roof's acknowledgment of it eliminate the need for evidence of prior similar crimes.[309]

While prior similar incidents are *one* way to show reasonable foreseeability, Georgia law is clear they are not the *only* way. "[P]rior similar incidents on a [owner's] premises [are] not always required to establish that a danger was reasonably foreseeable." *Wade v. Findlay Mgmt., Inc.*, 253 Ga. App. 688, 690 (2002). Reasonable foreseeability can also be proven with evidence that the owner "acknowledge[d]" the danger at issue, or "a danger could be so obvious that an issue for jury determination could exist regarding notice and/or foreseeability despite the absence of a prior similar incident on those premises." *Wallace v. Boys Club*, 211 Ga. App. 534, 536 n.2 (1993). Evidence exists from which a jury could conclude both that Red Roof Defendants acknowledged the danger trafficking posed at these locations and that the danger was obvious.

*First*, prior similar incidents are unnecessary to warn a defendant of what it already knows, and as early as 2010, the Smyrna property employees—then,

---

[309] Varahi does not raise this argument, apparently acknowledging that a jury could find that the criminal acts that injured Plaintiffs were reasonably foreseeable.

employees of Red Roof Inns, Inc.[310]—were aware prostitution was occurring there in spades.[311] And Buckhead employees were aware of prostitution no later than 2011.[312]

This employee knowledge is sufficient notice to the Red Roof Defendants. State law on agency applies to claims brought under state law. *Gustin v. Nicoll*, 824 F. App'x 875, 877–78 (11th Cir. 2020); *Kahn v. Visador Holding Corp.*, No. 2:07-cv-73, 2009 WL 10668538, **2–3 (N.D. Ga. Jul. 17, 2009). Under O.C.G.A. § 10-6-58, "[n]otice to the agent of any matter connected with [their] agency shall be notice to the principal." The statute sets forth a simple rule, and such notice is *actual*, not merely constructive. Precedent confirms the statutory language. "It is elementary that the knowledge of employees or agents acting within the scope of their authority is attributable to the employer or principal." *Marietta v. Godwin*, 106 Ga. App. 113, 116–17 (1962); *see also German Am. Mut. Life Ass'n v. Farley*, 102 Ga. 720, 737 (1897) (holding same). Although this rule applies to any agency relationship, it is particularly important for corporations, which "unlike individuals," "can acquire knowledge only through" their agents. *German*, 102 Ga. at 737. Thus, the testimony of employees who witnessed prostitution at these locations in 2010–12 supports an inference that Red

---

[310] Limbert Dep. Vol. 1 (Ex. 31) 143:4–8.
[311] Castille Dep. (Ex. 19) 42:22–25; Cole Dep. (Ex. 15) 28:3–10, 36:18–22 (Smyrna).
[312] *E.g.*, Cole Aff. (Ex. 65) ¶ 4; Cole Dep. (Ex. 15) 30:23 (Buckhead); Thomas Dep. (Ex. 14) 27:21–24, 56:6–16.

Roof Inns, Inc., at a minimum, had knowledge of the same and, therefore, did not need other evidence of similar criminal acts then.

*Second*, by 2012, Red Roof's corporate employees had acknowledged the risk of trafficking by alerting location level staff to its occurrence. At both the Smyrna and Buckhead properties, flyers appeared in the employee breakrooms in March 2012 listing indicators of human trafficking and mentioning the "sex trade" specifically.[313] The "Red Roof Inn Memorandum" accompanying the flyer read, "Human traffickers rely on businesses to sustain trafficking operations. The travel … and hotel industries, among others, are used by traffickers to transport, market and exploit their victims."[314] This is direct evidence that at least four Red Roof Defendants, who together owned, operated, and staffed these hotels,[315] acknowledged not just the risk of trafficking but the risk *at these locations*. And it's not the only direct evidence.

*Third,* by 2014, the Red Roof Defendants' joint 30(b)(6) designee confirmed that the brand was training some employees regarding the risk of human trafficking.[316] The training reported that "[h]uman trafficking is the second largest organized crime in the

---

[313] Ex. 87 at 11; Moyer Dep. (Ex. 18) 169:7–17 (testifying that the flyers were posted at Smyrna and Buckhead).
[314] Ex. 87 at 11.
[315] FMW and RRI III were owners. RRI West was manager. Red Roof Inns, Inc. employed the location staff.
[316] Wehrle Dep. 30(b)(6) (Ex. 42) 105:20–106:6.

world,"[317] explained that hotels were "anonymous and low risk" locations for traffickers,[318] and listed "signs of a trafficker."[319] In other words, the training identified trafficking's prevalence, consequences, and signs with specificity, and thereby acknowledged its danger. *Wallace*, 211 Ga. App. at 536 n.2

*Fourth*, the danger was also obvious. Again, expert testimony confirms that by the "early 2000s," the hotel industry was aware "that human trafficking posed a significant problem" in the industry.[320] As described above in Background Part III.C, various industry groups and publications had recognized this risk, and the Red Roof brand's then-president, Andy Alexander, was receiving publications and invitations to conferences addressing the lodging industry's role in fighting human trafficking.

*Fifth*, as shown above in Background Part III.C, Red Roof also knew that sex trafficking arrests were happening at Red Roof Inns across the country. Thus, the risk was not obvious based only on industry experience, it was obvious based on Red Roof's own experience.

### 2. *Though unnecessary, there is ample evidence of prior similar crimes at both locations.*

---

[317] Ex. 146 at 8.

[318] Ex. 146 at 23.

[319] Ex. 146 at 25. Those signs—including paying daily and with cash, lingering outside the hotel room door while male guests are inside, and being "seen with a group of women"—are the same signs visible at the Smyrna and Buckhead Inns.

[320] Tallis Report (Ex. 140) at 7.

While Georgia law makes clear that "prior similar incidents [are] not the only way to establish foreseeability," *Shadow v. Fed. Exp. Corp.*, 359 Ga. App. 772, 779 (2021), Plaintiffs' claims would survive summary judgment even if they were. "In determining whether previous criminal acts are substantially similar to the occurrence causing harm, thereby establishing the foreseeability of risk, the court must inquire into the location, nature and extent of the prior criminal activities and their likeness, proximity or other relationship to the crime in question." *Sturbridge Partners v. Walker*, 267 Ga. 785, 786 (1997). This evidence easily satisfies the standard under Georgia law.

As an initial matter, prior incidents of prostitution are sufficiently similar to the crimes that caused Plaintiffs' injuries—namely, keeping a place of prostitution, prostitution, pimping, and sexual servitude[321]—to make the latter crimes foreseeable. "Substantially similar" to the litigated incident "does not mean identical." *Sturbridge*, 267 Ga. at 786. Nor must the defendant "have contemplated or even be able to anticipate the particular consequence which ensued, or the precise injuries sustained by the plaintiff." *Henderson v. Nolting First Mortg. Corp.*, 184 Ga. 724, 737 (1937). Prostitution shares elements with the crimes that injured Plaintiffs, and the prior

---

[321] *Supra* Argument Part I.B.2–3 (identifying the same offenses as predicate acts for the purposes of Plaintiffs' civil RICO claims).

94

incidents occurred on the same premises and during or within a few years of Plaintiffs' trafficking.[322] The prior incident need only be "sufficient to attract the [defendant's] attention to the dangerous condition," *Sturbridge*, 267 Ga. at 786, and prior prostitution at these hotels is certainly sufficient to attract Defendants' attention to continued commercial sex. After all, Defendants' own witnesses acknowledge prostitution and trafficking share common indicators.[323]

*McCoy v. Gay* does not compel a different result. 165 Ga. App. 590, 593 (1983). In *McCoy*, the Court of Appeals ruled that, among other things, a parking lot shooting a decade earlier did not make a later armed attack reasonably foreseeable. *Id.* at 593. The *McCoy* panel reasoned that the danger of a poorly lit parking lot—the litigated condition—was not made foreseeable by two robberies that took place just outside the building's doors. *Id.* at 592. Here, the incidents are much closer in temporal proximity to Plaintiffs' injuries, and the dangers of commercial sex work at hotels were not only made foreseeable by previous incidents of commercial sex, those dangers and their application in hotels specifically were also known to the Red Roof Defendants, as

---

[322] Georgia's courts have largely accepted, as temporally relevant, events within roughly five years of a plaintiff's injury. *E.g.*, *Little-Thomas v. Select Specialty Hosp.-Augusta, Inc.*, 333 Ga. App. 362, 368 (2015); *Camelot Club Condo. Ass'n, Inc. v. Afari-Opoku*, 340 Ga. App. 618, 621 (2017).

[323] McElroy Dep. (Ex. 44) 26:24–28:9; Limbert Dep. Vol. 1 (Ex. 31) at 80; Stocker Dep. 30(b)(6) (Ex. 26) 36:25–39:15; Vittatoe Dep. (Ex. 43) 83:14–20.

shown by their own documents.[324]

Next, multiple sources of information alerted Defendants to these prior incidents. *First,* the consumer feedback detailed in Background Part I.C., and summarized in Plaintiffs' compilation Exhibits A and B, alerted Red Roof as early as 2011 in Smyrna and Buckhead that prostitution was occurring there. Nor can Defendants dismiss the consumer reports as hearsay. Evidence offered "to show its effect on the hearer," *i.e.*, what the hearer was told even if not true, is not hearsay. *Rivera*, 780 F.3d at 1092; *see also, e.g.*, *Soden v. Freightliner Corp.* 714 F.2d 498, 508 (5th Cir. 1983) (holding that unproven "allegations alone" could constitute "evidence of notice" of substantially similar prior incidents); *Gardner v. Q.H.S., Inc.*, 448 F.2d 238, 242, 244 (4th Cir. 1971) (rejecting a hearsay objection to customer letters providing notice of the same defect that injured the plaintiff).

Georgia courts apply the same hearsay rule under O.C.G.A. § 24-8-801(c). Complaints of similar crimes are *not* hearsay because they are "not offered to prove that the incidents had occurred .... but to show that the offenses had been reported to [the defendant]." *MARTA v. Allen*, 188 Ga. App. 902, 905 (1988). "[It] is admissible to explain conduct and ascertain motives, not as hearsay, but as original evidence." *Id.; see also Walker*, 303 Ga. App. at 713 (rejecting hearsay objection to complaints of

---

[324] Ex. 87 at 11.

similar crimes and holding that such complaints "provide[] such reasonable grounds for the defendants to appreciate that another [incident] would occur.").

*Second,* as described in Part I.B, above, police reports confirm prior incidents of prostitution at both locations. And Defendants did not need to search police files to be made aware of police activity. With regard to Buckhead in particular, police reports show that officers interacted with Red Roof employees when making prostitution arrests, as the officers relied on staff to determine in whose name rooms were rented. In 2013, for example, officers interacted with hotel staff when they arrested a woman for prostitution at Buckhead whose room had been rented for her by Anthony Shivers,[325] the same man who—in 2015, as Michele Sarkisian reported to Red Roof executives—trafficked women at Smyrna.[326] The same year, DeKalb Police made arrests at the location for prostitution, pimping, and keeping a place of prostitution.[327] In 2014, police investigating an attempted robbery involving a prostitute also interacted with hotel employees.[328]

### 3.    *A jury must decide whether Plaintiffs had equal knowledge.*

Finally, Defendants erroneously argue that summary judgment is proper because

---

[325] Ex. 56.
[326] *Supra*, Background, Part III.A.
[327] Ex. 55.
[328] Ex. 58.

Plaintiffs had superior knowledge of the traffickers' propensities and intent.[329] This comparative fault argument is a jury issue regarding apportionment, and it requires that a plaintiff both "have equal or superior knowledge of the risk *and* fail[] to exercise ordinary care." *Brookview Holdings, LLC v. Suarez*, 285 Ga. App. 90, 97–98 (2007). Defendants' fail on the second prong, as the same evidence that would permit a jury to find that Plaintiffs were at the hotels involuntarily, in Argument, II.B, precludes summary judgment on an equal knowledge defense. Because Plaintiffs were at the hotels involuntarily, there is no amount of care they could have undertaken to prevent their injuries.

### C. The Red Roof Defendants are directly liable for their own conduct.

Red Roof Defendants seek summary judgment for the Smyrna property after Varahi purchased the hotel in December 2012. They argue that, as franchisor, they are not liable for the acts of Varahi. But the Red Roof Defendants remain liable for their own employees' post-December 2012 knowledge and conduct, which is well-documented. And generally, whether a defendant is liable for its employees' knowledge and conduct is a jury question "except in plain and indisputable cases." *Remediation Res., Inc. v. Balding*, 281 Ga. App. 31, 32 (2006).

---

[329] O.C.G.A. § 51-12-33(a) abolished the defense of assumption-of-risk in favor of a comparative fault analysis.

### D. Plaintiffs' negligence claims are not time-barred.

Despite Varahi's[330] half-hearted contrary argument, O.C.G.A. § 9-3-99 tolls negligence claims. By its plain terms, § 9-3-99 applies to "*any* cause of action in tort that may be brought by the victim of an alleged crime" arising out of the same facts as that crime. The statute tolls the claim until the prosecution "has become final or otherwise terminated" or six years, whichever is shorter. *Id.* As now-Justice Peterson wrote in *Harrison v. McAfee*, the statute's application does not depend "on the identity of the civil defendant," 338 Ga. App. 393, 399 (2016), and it applies so long as there "could" be a criminal prosecution "in the future," *Jenkins v. Keown*, 351 Ga. App. 428, 433 (2019), even if one never occurs. *Harrison*, 338 Ga. App. at 399–400. As just one example, felonies in Georgia—including Georgia's criminal prohibition of sex trafficking, O.C.G.A. § 16-5-46—are subject to a 4-year limitations period for crimes against adults and 7 for those against minors, *id.* § 17-3-1(c). Only after that could there no longer be a future criminal prosecution. This gives adult plaintiffs at least 6 years in which to bring their negligence claims—the 4-year criminal limitations period, § 17-3-1, during which the limitations period for the civil action is tolled, § 9-3-99, plus the 2 years offered by § 9-3-33. Meanwhile, a minor plaintiff would be entitled to eight years—the maximum 6 years offered by § 9-3-99, as the 7-year limitation period is

---

[330] The Red Roof Inn Defendants do not move for summary judgment on this basis.

greater than 6, plus the 2 years under § 9-3-33. The Plaintiffs claims are all timely. DP, EH, MB, RP, and WK, filed their claims on December 29, 2021.[331] DP, EH, MB, and RP were last trafficked at Smyrna within six years of December 29, 2021.[332] WK, meanwhile, is entitled to 8 years because she was a minor when her trafficking ended in 2014,[333] making the 2021 complaint timely as to her too. Because the applicable criminal limitations period is seven years, O.C.G.A. § 17-3-1, § 9-3-99 tolls her claim for six years, and she has two additional years thanks to § 9-3-33. Thus, her claims, filed less than eight years from the end of her trafficking, are also timely.

## CONCLUSION

The Defendants' employees admitted to knowing about prostitution and sex trafficking. That means *Defendants* knew about prostitution and sex trafficking. But Defendants continued to rent rooms to known prostitutes and sex traffickers and to profit from it. In the words of Georgia RICO, that's a pattern of racketeering activity. In the words of the TVPRA, that's knowingly benefiting from participation in a venture. And because Plaintiffs were directly injured by this conduct, they are entitled to recover under Georgia RICO, the TVPRA and Georgia negligence law. Summary judgment should be denied.

---

[331] Doc. 1.

[332] DP (2017); EH (2018); MB (2016); RP (2016).

[333] WK Dep. (Ex. 11) 177:24–178:1.

This 3rd day of March, 2023.

/s/ Tiana S. Mykkeltvedt

| | |
|---|---|
| Jonathan S. Tonge | John E. Floyd |
| jtonge@atclawfirm.com | Georgia Bar No. 266413 |
| Georgia Bar No. 303999 | floyd@bmelaw.com |
| Patrick J. McDonough | Tiana S. Mykkeltvedt |
| Georgia Bar No. 489855 | Georgia Bar No. 533512 |
| pmcdonough@atclawfirm.com | mykkeltvedt@bmelaw.com |
| | Manoj S. Varghese |
| ANDERSEN, TATE & CARR, P.C. | Georgia Bar No. 734668 |
| One Sugarloaf Centre | varghese@bmelaw.com |
| 1960 Satellite Boulevard, Suite 4000 | Amanda Kay Seals |
| Duluth, Georgia 30097 | Georgia Bar No. 502720 |
| (770) 822-0900 – Telephone | seals@bmelaw.com |
| (770) 822-9680 – Facsimile | Michael R. Baumrind |
| | Georgia Bar No. 960296 |
| | baumrind@bmelaw.com |
| | Juliana Mesa |
| | Georgia Bar No. 585087 |
| | mesa@bmelaw.com |

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, Georgia 30309
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

**Attorneys for Plaintiffs**

**<u>LOCAL RULE 7.1(D) CERTIFICATION</u>**

The undersigned counsel certifies that this document has been prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1(C) and does not exceed the page limit imposed by Local Rule 7.1(D).

<u>*/s/ Tiana S. Mykkeltvedt*</u>
Tiana S. Mykkeltvedt
Georgia Bar No. 533512

1

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the within and foregoing PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

This 3rd day of March, 2023.

/s/ Tiana S. Mykkeltvedt
Tiana S. Mykkeltvedt
Georgia Bar No. 533512